STEPHAN C. VOLKER (CSB #63093)                                    10.619.02
ALEXIS E. KRIEG (CSB #254548)
STEPHANIE L. CLARKE (CSB #257961)
JAMEY M.B. VOLKER (CSB #273544)
LAW OFFICES OF STEPHAN C. VOLKER
1633 University Avenue
Berkeley, California 94703
Tel:    510/496-0600
Fax:    510/845-1255

Attorneys for Plaintiff
DESERT PROTECTION SOCIETY, a California nonprofit
public benefit corporation

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DESERT PROTECTION SOCIETY, a California nonprofit public benefit corporation,<br><br>               Plaintiff,<br><br>     vs.<br><br>DAVID BERNHARDT, in his official capacity as Acting Secretary of the United States Department of the Interior; JOE STOUT, in his official capacity as Acting State Director of the United States Bureau of Land Management for California; UNITED STATES BUREAU OF LAND MANAGEMENT, a federal agency; and UNITED STATES DEPARTMENT OF THE INTERIOR, a federal agency,<br><br>               Defendants. | Civ. No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      This is a public interest citizens' lawsuit to enforce this nation's environmental laws.  In 1976 Congress enacted unprecedented protection for the California Desert Conservation Area ("CDCA") in recognition of the fact that "the California desert environment is a total ecosystem that is extremely fragile, easily scarred, and slowly healed," and because "the California desert environment and its resources, including certain rare and endangered species of wildlife, plants, and fishes, and numerous archeological and historic sites, are seriously threatened by air pollution, inadequate Federal management authority, and pressures of increased use . . . ."  43 U.S.C. §§ 1781(a)(2) and (3).  Congress directed the Secretary of the Interior to

1   "prepare and implement a comprehensive, long-range plan for the management, use,

2   development, and protection of the public lands within the California Desert Conservation Area"

3   in part "to conserve these resources for future generations."  43 U.S.C. §§ 1781(d), 1781(a)(4).

4   The Bureau of Land Management ("BLM") first published its CDCA Plan in 1980, and has since

5   amended it numerous times.  This Plan recognizes the critical importance of pursuing activities

6   such as "energy development and transmission . . . *without compromising* the basic desert

7   resources of soil, air, water, and vegetation, or public values such as wildlife, cultural resources,

8   or magnificent desert scenery."  CDCA Plan at 6 (emphasis added).

9       2.      Plaintiff DESERT PROTECTION SOCIETY is a non-profit public benefit citizens'

10  organization that seeks to protect thousands of acres of the CDCA from groundwater depletion

11  and pollution and industrial-scale energy development in the form of the Eagle Crest Energy Gen-

12  Tie and Water Pipeline Right-of-Way Project (the "Project").

13      3.      The Project includes the construction of two reservoirs (both 17,700 acre-feet in

14  volume) for pumped storage electrical generation, along with a substation and switchyard, service

15  roads, an administration building, and associated transmission facilities.  The Project will be built

16  on an ecologically sensitive and earthquake-prone site within the original boundaries of Joshua

17  Tree National Monument, and requires construction of off-site powerlines and a water pipeline.

18  The Project will fundamentally alter the CDCA by depleting the already over-tapped Chuckwalla

19  Valley Groundwater Basin, despoiling irreplaceable scenic resources, destroying wildlife habitat,

20  threatening pollution of groundwater with acidic leachate, and degrading the Joshua Tree

21  National Park that surrounds the Project site on three sides.

22      4.      Plaintiff challenges the August, 2018 approval of the Project by defendants DAVID

23  BERNHARDT, JOE STOUT, UNITED STATES BUREAU OF LAND MANAGEMENT, and

24  UNITED STATES DEPARTMENT OF THE INTERIOR (collectively, "BLM" or "BLM

25  defendants") because it violates the National Environmental Policy Act ("NEPA"), 42 U.S.C.

26  section 4321 *et seq*., the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. section

27  1701 *et seq*., the Administrative Procedure Act ("APA"), 5 U.S.C. sections 701 *et seq*., and

28  regulations implementing these statutes.

1    5.    BLM's approval of the Project violates NEPA because BLM failed to address, let
2    alone answer, substantial questions regarding the Project's significant adverse environmental
3    impacts.  Because the Project clearly violated the existing CDCA Plan, to accommodate the
4    Project BLM purported to amend the CDCA Plan and, as part of that attempted amendment,
5    BLM prepared an Environmental Assessment ("EA") and Finding of No Significant Impact
6    ("FONSI") under NEPA.  BLM's April 2017 EA and FONSI for its Proposed California Desert
7    Conservation Area Plan Amendment ("CDCA Land Use Plan Amendment" or "LUPA") fail to
8    take the requisite "hard look" at the Project's impacts, impermissibly defer formulation of
9    measures to mitigate those impacts, and fail to consider a reasonable range of Project alternatives.
10   Instead, the EA relies on and tiers to the Federal Energy Regulatory Commission's ("FERC's")
11   outdated and inadequate 2012 Final Environmental Impact Statement ("FEIS") for a different,
12   previous version of the Project.  Both the EA and FEIS fail to answer "substantial questions"
13   about whether the Project "may have a significant effect upon the human environment," and
14   therefore fall short of NEPA's "hard look" requirement. *Foundation for North American Wild*
15   *Sheep v. U.S. Department of Agriculture* ("*Wild Sheep*"), 681 F.2d 1172, 1178 (9th Cir. 1982).
16   Consequently, NEPA requires BLM to prepare its own EIS to fully analyze the Project's
17   environmental impacts, measures to mitigate those impacts, and Project alternatives that would
18   lessen or avoid those impacts.

19   6.    BLM's approval of the Project violates FLPMA because BLM ignored its duties
20   under this statute.  FLPMA mandates that before BLM may amend a land use plan it must "give
21   priority to the . . . protection of areas of critical environmental concern," "consider [the] relative
22   scarcity of the values involved and the availability of alternative means . . . and sites for the
23   realization of those values," and "[to] weigh the long-term benefits to the public against the short-
24   term benefits."  43 U.S.C. § 1712(c)(3), (6), (7).  But BLM failed to weigh the actual costs and
25   benefits of the Project when it purported to adopt the CDCA Plan Amendment and grant Eagle
26   Crest Energy Company ("Eagle Crest") a Right-of-Way ("ROW") for the Project because BLM
27   never prepared an updated EIS to address those impacts.  BLM committed thousands of acres of
28   public lands within the CDCA to either direct physical or indirect visual intrusion by industrial

1  development without first conducting an adequate environmental review.  And, contrary to
2  FLPMA's requirement that BLM prioritize protection of Areas of Critical Environmental
3  Concern ("ACECs") and protect critical habitat of listed species, BLM did neither, and allowed
4  the Project to harm both.  BLM also ignored FLPMA's requirement that the Project utilize
5  common rights-of-way ("collocation") to "minimize adverse environmental impacts and the
6  proliferation of separate rights-of-way."  43 U.S.C. § 1763; EA at 1, 5.  In violation of FLPMA's
7  collocation mandate, the "proposed transmission line would result in the creation of a new utility
8  corridor removed from pre-existing transmission lines" that would create greater "disturbance to
9  intact desert tortoise habitat" and "contribute to incremental erosion of the large open spaces the
10 utility corridors are designed to preserve."  FEIS at 171, 186, 229.

11      7.      Plaintiff timely objected to these NEPA and FLPMA violations.  On May 17, 2017
12 plaintiff timely protested BLM's approval on April 17 and 20, 2017, respectively, of its LUPA
13 and EA/FONSI for the Project.  But despite the Project's violations of these laws and its severe
14 and irreparable environmental impacts, on August 1, 2018, BLM dismissed plaintiff's Protest.
15 BLM falsely claimed that plaintiff's Protest "included comments, opinions, and observations
16 which were not substantiated with a concise statement of why [BLM's] proposed decision is
17 believed to be wrong; issues not previously raised in the planning process; and/or issues not
18 germane to the planning process."

19      8.      Each of BLM's grounds for dismissing plaintiff's Protect is false.  To the contrary,
20 plaintiff's Protest was thoroughly "substantiated" with an extensive discussion of the factual and
21 legal reasons why the Project violated NEPA, FLPMA and other environmental laws.  BLM's
22 perfunctory dismissal of plaintiff's Protest was arbitrary and capricious because it ignored the
23 substance of the Protest and failed to explicate any reasoned basis for its summary rejection of
24 plaintiff's objections.  BLM's dismissal was also contrary to FLPMA and its regulations, which
25 require BLM to follow and apply in a rational manner applicable environmental laws in its
26 adjudication of land use protests.

27      9.      Accordingly, BLM's approval of the Project was unlawful and must be set aside.
28 Therefore plaintiff seeks orders from this Court:  (1) granting preliminary injunctive relief

restraining defendants from taking any action in connection with the Project that would result in any change to the physical environment pending a full hearing on the merits; (2) declaring defendants violated the APA by failing to comply with NEPA and FLPMA; and (3) granting mandamus and permanent injunctive relief setting aside BLM's approvals of its LUPA and ROW grant, pending defendants' compliance with NEPA, FLPMA, and the APA.

## JURISDICTION AND VENUE

10.    The Court has jurisdiction over this action under 28 U.S.C. sections 1331 (federal question), 1337 (regulation of commerce), 1346 (United States as defendant), 1361 (mandamus against an officer of the United States), 2201 (declaratory judgment), and 2202 (injunctive relief), and under the APA, 5 U.S.C. sections 701-706 (review of final agency action) because (1) the action arises under the APA, NEPA, and FLPMA; (2) BLM is an agency of the United States government and the individual defendants are sued in their official capacities as officers of the United States; (3) the action seeks a declaratory judgment voiding BLM's final agency approval of the LUPA; and (4) the action also seeks further injunctive and mandamus relief until BLM complies with applicable law.

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. section 1391(e)(2) because BLM and one or more individual defendants officially reside in this judicial district.

12.    There exists now between the parties hereto an actual, justiciable controversy in which plaintiff is entitled to have a declaration of its rights, a declaration of BLM's obligations and further relief because of the facts and circumstances hereinafter set forth.

13.    This Complaint is timely filed within the applicable six-year statute of limitations set forth in 28 U.S.C. section 2401(a).

14.    Plaintiff has standing to assert its claims and has exhausted all applicable remedies.

## PARTIES

15.    Plaintiff DESERT PROTECTION SOCIETY – formerly known as Citizens for the Chuckwalla Valley –  is a public benefit charitable corporation that has been awarded tax-exempt status under 26 U.S.C. section 501(c)(3).  Its unpaid volunteer members are residents of Eagle Mountain/Desert Center, Native Americans, and local environmental activists from San

Bernardino, Imperial, San Diego, and Riverside Counties, California, and Nevada.  Originally formed in 1990 to prevent placement of the world's largest garbage dump in remote wildlife habitat surrounded on three sides by Joshua Tree National Park – a struggle which succeeded after a 17-year court battle – the Desert Protection Society continues to advocate for informed environmental stewardship and against activities that pose harms to the desert environment.  The Desert Protection Society and its members are vitally interested in proper land use planning and management of public lands in this area, and to restore and enhance their ecological integrity, scenic beauty, wildlife, recreational amenities, and natural, cultural and historic resources, including the vulnerable Chuckwalla Valley Groundwater Basin.  The Project will harm these public resources and thereby harm the Desert Protection Society's members who use and enjoy them.  The Desert Protection Society therefore seeks review of BLM's Project approvals.

16.    Plaintiff's injuries are fairly tracable to BLM's actions.  Construction and operation of the Eagle Crest Project will harm plaintiff's use of the Project area for recreational activities including nature study, wildlife and wildflower viewing, scenic enjoyment, photography, hiking, family outings, star gazing and meditation.  These injuries are actual, concrete, and imminent.  Plaintiff has no plain, speedy, or adequate remedy at law.  Accordingly, plaintiff seeks injunctive, mandamus, and declaratory relief from this Court to rectify BLM's unlawful acts and thereby redress plaintiff's injuries.

17.    To the extent required, plaintiff exhausted all available administrative remedies, including submission of numerous comment letters, participation as an intervenor in the FERC proceeding for the Project (FERC Project 13123), and the filing of its Protest challenging BLM's approval of the Project.

18.    Defendant DAVID BERNHARDT is the Acting Secretary of the United States Department of the Interior and, in that capacity, is responsible for BLM's Project approvals.  He is sued in his official capacity.

19.    Defendant JOE STOUT is the Acting State Director of BLM and is sued in his official capacity.  In that capacity, he is generally responsible for the activities of BLM statewide.  Defendant STOUT is responsible for BLM's approval of the CDCA Land Use Plan Amendment.

1    20.    Defendant UNITED STATES DEPARTMENT OF INTERIOR ("DOI") is the

2   federal agency charged with managing BLM and most of the nation's federally owned lands,

3   including the Project site at issue here.  DOI is also charged with ensuring BLM's compliance

4   with applicable laws, including but not limited to NEPA, and FLPMA, in the management of

5   those lands.

6    21.    Defendant UNITED STATES BUREAU OF LAND MANAGEMENT ("BLM") is

7   an agency within DOI.  Under federal law, BLM is charged with the management of federal lands

8   including the Project site for the benefit of the public and consistent with all applicable laws

9   including NEPA, FLPMA and the APA.

10                              **BACKGROUND**

11    22.    Eagle Crest proposes to construct and operate a massive pumped storage electrical

12   generation facility, including two 17,700-acre-foot reservoirs, a 500kV interconnection

13   transmission line ("gen-tie line"), a water supply pipeline and other ancillary facilities.  More

14   astonishingly, it proposes to build this misplaced industrial eyesore on an ecologically sensitive

15   and earthquake-prone site within the original boundaries of Joshua Tree National Monument.

16    23.    The Project encompasses 1,150 acres of sensitive and extraordinary public land and

17   1,377 acres of private land originally included in Joshua Tree National Monument in 1936, and

18   would impact thousands more acres of public lands due to the Project's 16 miles of electrical

19   transmission lines stretching over, and its miles of water pipeline extending under, the CDCA.  In

20   creating Joshua Tree National Park, Congress declared that the former Joshua Tree National

21   Monument  "boundaries as modified in 1950 and 1961 exclude and thereby expose to

22   incompatible development and inconsistent management, contiguous Federal lands of *essential*

23   *and superlative natural, ecological, archeological, paleontological, cultural, historical, and*

24   *wilderness values*."  16 U.S.C. § 410aaa-21(3) (emphasis added).  These former Monument lands

25   including the Project site have not yet been added to Joshua Tree National Park, but nonetheless

26   possess, as Congress has declared, outstanding natural, ecological, scenic, wildlife and wilderness

27   values that should be preserved rather than sacrificed for unneeded industrial-scale energy

28   development that uses more energy than it would generate, and depletes the already over-tapped

1  Chuckwalla Valley Groundwater Basin.

2      24.    The Project is located within the Desert Renewable Energy Conservation Plan

3  ("DRECP") area.  Contrary to FLPMA's express prohibition, the ROW that BLM granted allows

4  the Project's energy transmission lines to be placed in Areas of Critical Environmental Concern

5  (commonly known as "ACECs"), Development Focus Areas ("DFAs") and General Public Lands

6  ("GPLs") outside of the corridors that are designated for electric transmission lines.  As the EA

7  admits, these CDCA Plan "designations allow electric transmission to occur [only] in designated

8  corridors."  EA at 1.  Yet both the Project's gen-tie line and its water supply pipeline routes fall

9  *outside* BLM's designated utility line corridors.  EA at 1, 5 (Figure 1-2).  Because of this direct

10  conflict with the CDCA Plan, BLM approved its Land Use Plan Amendment, or LUPA, to the

11  CDCA Plan to allow the Project to proceed despite this conflict.  But as shown below, violations

12  of the CDCA Plan persist notwithstanding the LUPA.

13      25.    The Project is part of the larger Eagle Mountain Pumped Storage Hydroelectric

14  Project (FERC Project No. 13123-002 California) analyzed by FERC in its January 2012 FEIS,

15  and licensed by FERC on June 19, 2014.  EA at 11-12.  The Desert Protection Society – and its

16  predecessor, Citizens for the Chuckwalla Valley –  participated as an intervenor in the FERC

17  proceeding for the Project.  On March 1, 2010, the Citizens for the Chuckwalla Valley filed its

18  motion to intervene in that proceeding, and on February 28, 2011, it filed comments on FERC's

19  Draft Environmental Impact Statement.  After FERC issued a license for the Project on June 19,

20  2014, the Desert Protection Society timely filed an application for rehearing challenging FERC's

21  order on July 21, 2014.

22      26.    As plaintiff pointed out in its FERC rehearing petition, FERC's 2012 FEIS was

23  profoundly deficient.  Now, it is outdated as well.  Among other defects, the FERC FEIS:

24      (1)    ignores the decommissioning impacts and costs of the Project;

25      (2)    defers formulation of planned mitigation measures to address the Project's

26          significant environmental impacts;

27      (3)    omits the alternative of siting the Project closer to energy demand centers;

28      (4)    fails to adequately address conflicting scientific evidence regarding the Project's

1      adverse impacts on groundwater levels;

2  (5)    impermissibly delegates authority to determine maximum allowable drawdown to

3         the licensee rather than basing that decision on information developed in the EIS;

4  (6)    assumes acid drainage can be controlled without conducting the studies necessary

5         to ascertain whether this likely Project impact can be avoided or mitigated;

6  (7)    defers surveys of plant and animal species that may be harmed by the Project until

7         after Project approval;

8  (8)    fails to address likely climate change scenarios and instead impermissibly dismisses

9         consideration of this issue as "too speculative;"

10  (9)    fails to adequately address the cumulative impacts of the Project together with other

11         industrial-scale energy projects in the area and region; and

12  (11)   bases its discussion of the Project's impacts on pure speculation since neither Eagle

13         Crest nor FERC ever secured the right to access the Eagle Mountain lands claimed

14         by Kaiser – which opposed the Project – as necessary to conduct on-site

15         observations, testing, data gathering and other essential forms of field research, and

16         therefore no on-site examination of the Project site to evaluate the Project's

17         environmental impacts ever took place.

18      27.    Even BLM itself repeatedly acknowledged, both in its own prior comment letters

19  and its subsequent request to FERC for rehearing, that FERC's FEIS was inadequate.  EA at 18;

20  FEIS at A-5 to A-7 (plans in FEIS are not sufficiently developed, FEIS is inconsistent and

21  inaccurate), A-12 ("project would deplete the limited and valuable groundwater" and should

22  therefore not be considered renewable), A-16 (site plan needs to be more developed), A-19 to A-

23  20 (FEIS' terminology is misleading; FEIS must consider evaporation and energy loss), A-58 to

24  A-59 (FEIS fails to adequately address groundwater resources), A-69 to A-71 (FEIS fails to

25  adequately address brine disposal and wastewater concerns), A-74 to A-75 (FEIS fails to

26  adequately protect biological resources), A-80 to A-89 (same; FEIS fails to adequately address

27  impacts to the desert tortoise), A-104 (FEIS fails to adequately address air quality concerns), A-

28  108 to A-109 (FEIS fails to adequately address cumulative impacts) (Department of the Interior's

1  February 29, 2012 Comments on the FEIS for the Eagle Mountain Pumped Storage Hydroelectric

2  Project, FERC No. 13123-002).

3       28.    Yet rather than prepare its own EIS to *correct* the plenary deficiencies in FERC's

4  FEIS that BLM itself had enumerated in petitioning FERC to set aside the Project's license, BLM

5  abruptly reversed course without any explanation and prepared an EA that *relied* on and *tiered* to

6  FERC's FEIS.  BLM's flip-flop violated both NEPA and the APA.  It is settled law that "'[a]n

7  agency cannot simply disregard contrary or inconvenient factual determinations that it made in

8  the past, any more than it can ignore inconvenient facts when it writes on a blank slate.'"

9  *Indigenous Environmental Network v. U.S. Department of State*, ___ F.Supp.3d ___, 2018 WL

10  5840768, *12-13 (D. Mont. 2018), quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502,

11  537, 129 S.Ct. 1800 (2009).

12       29.    BLM released its Draft EA in October 2016, and its Final EA in April 2017.

13  Plaintiff submitted comments to BLM during the scoping process on December 28, 2015 and on

14  the Draft EA via two letters dated November 6, 2016 (reproduced in the Final EA as Letter I9 and

15  Letter N2).

16       30.    Relying on its inadequate EA and FERC's inadequate FEIS, BLM approved the

17  CDCA LUPA on April 17, 2017, and issued a FONSI for the Project on April 20, 2017.

18       31.    On May 17, 2017, plaintiff Desert Protection Society timely protested BLM's

19  approval of the Project, including its LUPA, EA and FONSI, for violations of NEPA, FLPMA,

20  and the APA.

21       32.    On August 1, 2018, BLM issued a perfunctory denial of Desert Protection Society's

22  May 17, 2017 Protest.

23       33.    Again relying on its inadequate EA, and in violation of both NEPA and FLPMA, on

24  August 1, 2018, BLM issued its Decision Record approving the ROW grant and the LUPA,

25  allowing construction and operation of the Project's gen-tie line, water pipeline, and ancillary

26  facilities through sensitive and irreplaceable wildlife habitat and nationally significant scenic

27  resources, and despite the Project's adverse impacts on the region's depleted groundwater

28  resources.

34.    On September 12, 2018, the Desert Protection Society appealed BLM's Decision Record granting the ROW to the Interior Board of Land Appeals ("IBLA"), pursuant to 43 C.F.R. § 4.411.  Plaintiff also filed its Petition for Stay at that same time, pursuant to 43 C.F.R. § 4.21.  The IBLA denied Desert Protection Society's Petition for Stay on November 26, 2018, on the alleged grounds that it had "not met its burden to show sufficient justification that in the absence of a stay, it will suffer immediate harm."  IBLA 2018-201, Desert Protection Society, Order, DOI-BLM-CA-D060-2016-0017-EA, November 26, 2018, p. 8.

35.    Because the IBLA denied plaintiff's Petition for Stay and thus failed to make BLM's Project approvals inoperative pending the appeal, the Desert Protection Society may now seek judicial review of BLM's approvals.  *Darby v. Cisneros*, 509 U.S. 137, 154 (1993) ("an appeal to 'superior agency authority' is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review;" original emphasis); *National Parks and Conservation Association v. Bureau of Land Management* ("*NPCA*"), 606 F.3d 1058, 1064 (9th Cir. 2010) (if an "Appeals Board fails to act upon a petition for stay or denies such a petition, the decision becomes effective immediately"); *Desert Citizens Against Air Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000) (court reviewed BLM's record of decision as the final agency action because the IBLA had – as here – denied a petition for stay); *Center for Biological Diversity v. U.S. Department of Interior*, 255 F.Supp.2d 1030 (D.Ariz. 2003).

36.    Even though the IBLA's failure to rule on Desert Protection Society's Petition for Stay within 45 days, and its subsequent denial of that petition, caused the Decision Record to "become effective immediately," out of an abundance of caution Desert Protection Society also moved to dismiss its IBLA appeal on January 31, 2019 pursuant to 43 C.F.R. § 4.21(a)(3).  While the Decision Record is now subject to judicial review with or without a formal dismissal of the Desert Protection Society's appeal, plaintiff's motion for dismissal ensures that there could not be "'two independent, and potentially conflicting 'final' agency actions'" in this matter. *Backcountry Against Dumps v. Abbott*, 2011 WL 13176672, 3 (June 30, 2011) (citing *NPCA*, 606 F.3d at 1064 n. 2).

37.    Plaintiff hereby challenges BLM's Project approvals and associated environmental review under NEPA, FLPMA and the APA.

**FIRST CLAIM FOR RELIEF**

(BLM's ROW Grant Violated the National Environmental Policy Act

and the Administrative Procedure Act)

(Against All Defendants)

38.    The paragraphs set forth above and below are realleged and incorporated herein by reference.

39.    Defendants violated NEPA, 42 U.S.C. section 4321 *et seq.,* and its implementing regulations, 40 C.F.R. section 1500 *et seq.*, by approving the Project without first analyzing the Project's environmental impacts – and measures or Project alternatives to mitigate those impacts – in adequate detail and scope.  FERC's 2012 FEIS was demonstrably incomplete and obsolete, and thus BLM's reliance upon it was contrary to NEPA and the APA.  BLM's EA does not rectify these deficiencies because it "fail[s] to address certain crucial factors, consideration of which was essential to a truly informed decision whether or not to prepare an EIS." *Wild Sheep*, 681 F.2d at 1178; *Center for Biological Diversity v. National Highway Traffic Safety Administration* ("*CBD v. NHTSA*"), 538 F.3d 1172, 1215-1227 (9th Cir. 2008) (revised EA required).  Furthermore, "substantial questions are raised whether [the] project may have a significant effect upon the human environment," and, as noted above, those impacts were not adequately analyzed in a previous EIS. *Wild Sheep*, 681 F.2d at 1178.  As a result, NEPA requires BLM to prepare an EIS to fully analyze the Project's environmental impacts, measures to mitigate those impacts, and Project alternatives that would lessen or avoid the impacts.

40.    Defendants' approval of the Project without complying with NEPA constitutes a failure to proceed in accordance with law in violation of the APA, 5 U.S.C. section 706(2)(A) and (D).  Without limitation, BLM's actions violate NEPA and are therefore unlawful in the respects alleged below.

**The EA and FEIS Fail to Take a "Hard Look" at the Project's Impacts**

41.    An EA must "adequately consider[] and elaborate[] the possible consequences of

the proposed agency action when concluding that it will have no significant impact on the environment." *CBD v. NHTSA*, 538 F.3d at 1215. It must take a "hard look" at the environmental consequences of the project, or "tier to an EIS that reflects such an analysis." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 895-896 (9th Cir. 2002) (holding that the EA for a timber sale and road density amendment violated NEPA by not analyzing the cumulative impacts of other proposed road density amendments in the same national forest); *Klamath-Siskiyou Wildlands Center v. Bureau of Land Management* ("*Klamath-Siskiyou*"), 387 F.3d 989, 997-998 (9th Cir. 2004) (holding that EAs for two timber sales on BLM land violated NEPA despite tiering to an EIS for the relevant regional management plan because "[n]either in the RMP-EIS nor in the EAs does the agency reveal" the cumulative effects of logging in the affected watershed); *Wild Sheep*, 681 F.2d at 1178. An EA violates NEPA where it fails to address "crucial factors, consideration of which was essential to a truly informed decision whether or not to prepare an EIS." *Wild Sheep*, 681 F.2d at 1178.

42.     Here, as demonstrated below, BLM failed to take the requisite "hard look" at the Project's environmental impacts regarding (1) Project decommissioning, (2) acid rock drainage, (3) groundwater overdraft, (4) wildlife, (5) global warming, and (6) cumulative effects.

***Project Decommissioning***

43.     The EA states that, prior to facility closure, a decommissioning plan would be developed for the Project "in coordination with the BLM." EA at 50. But like the inadequate FEIS to which it tiers, the EA fails to provide any specific information on the likely contents of the decommissioning plan or analyze the environmental impacts of the decommissioning activities. EA at 49 ("a final Decommissioning Plan would be developed in the future"); FEIS, Appendix at A-2 ("decommissioning is beyond the scope of this final EIS"). This violates NEPA because, among other reasons, the EA relies on the putative decommissioning plan to conclude that the Project would avoid certain significant impacts. *E.g.* EA at 127 (concluding Project "would have no significant irretrievable commitments" of resources in part because many of the Project's structural materials "would most likely be recycled or reused upon decommissioning" of the Project). NEPA requires that EAs describe mitigation measures – like the decommissioning

1  plan here – with sufficient detail to assess how well they "will serve to mitigate the potential

2  harm" they target. *Wild Sheep*, 681 F.2d at 1181 (quote); *South Fork Band Council v. U.S.*

3  *Department of Interior* ("*South Fork*"), 588 F.3d 718, 727 (9th Cir. 2009).

4  ***Acid Rock Drainage***

5      44.    BLM's EA and FERC's FEIS both acknowledge that the Project could cause acid

6  rock drainage. "[W]ater stored in the reservoirs" could interact with the "surrounding material in

7  the exposed mine pit" to "form sulfate and acidic conditions," which "then interact with the

8  surrounding materials and leach out" a toxic brew of "arsenic, copper, cadmium, silver, zinc, and

9  other heavy metals." EA Response to Comments at 335-336 (quotes); FEIS at 91-94. Seismic

10  events including  ground shaking and potential surface rupture would increase the risk of

11  reservoir lining failure, reservoir seepage and acid rock drainage, resulting in contamination of

12  groundwater.

13      45.    Yet prior to FEIS and EA preparation, neither BLM, FERC, Eagle Crest nor anyone

14  else conducted the "onsite reconnaissance and subsurface investigations" required to determine

15  whether the proposed reservoir liner materials would be "sufficiently impermeable" to avoid

16  seepage and the formation of acid rock drainage. FEIS at A-33 (quotes). Nor did they obtain

17  "specific measurements of the mineralogy and toxic metal content of the material that would

18  come into contact with project waters," rendering the "extent of acid production . . . speculative."

19  FEIS at 94. They also failed to "conduct the subsurface investigations" and "geotechnical study"

20  necessary to more accurately determine the "risk of surface rupture at the project area" and

21  "anticipated ground shaking related to earthquake activity in the region," and whether the

22  "existing project designs" would need to be "modif[ied]" accordingly to, among other things,

23  mitigate risk of seepage and acid rock drainage. FEIS at 56 (quotes); EA Response to Comments

24  at 337 (deferring to FERC's analysis and conclusions).

25      46.    Instead, FERC conditioned its license on Eagle Crest conducting numerous future

26  studies – *after* Project approval – including an on-site "investigation to determine the acid

27  formation potential of the particular geology in the pits," tests of the "excavated material for acid

28  producing potential," and "develop[ing] information and prepar[ing] reports related to seismicity

1  and the structural integrity of project works."  EA Response to Comments at 311 (first two

2  quotes), 111 (third quote).  This post-approval environmental review is the antithesis of the "look

3  before you leap" purpose of NEPA.

4        47.    Deferral of "onsite reconnaissance and subsurface investigations" until *after* the

5  NEPA process and Project approval made it impossible for the EA to "foster [the] informed

6  decision-making and informed public participation" required *before* agency action.  *State of*

7  *California v. Block* ("*Block*"), 690 F.2d 753, 761 (9th Cir. 1982) (second quote).  As the EA itself

8  acknowledges, only post-EA, post-approval "[i]mplementation of the required Phase 1 Pre-

9  Design Site Investigation Plan will provide the data *necessary to make quantitative*

10 *determinations* about the FERC Project's effect on [acid rock drainage]."  EA at 110 (emphasis

11 added).

12       48.    "This type of post-licensing data gathering violates NEPA's very letter and

13 purpose."  *LaFlamme v. FERC*, 852 F.2d 389, 400 (9th Cir. 1988).  Without the data from the

14 planned on-site investigations, BLM cannot possibly "supply a convincing statement of reasons

15 why [the] project's impacts are insignificant."  *Blue Mountains Biodiversity Project v. Blackwood*

16 ("*Blue Mountains*"), 161 F.3d 1208, 1212 (quote, internal quotations and citation omitted);

17 *LaFlamme*, 852 F.2d at 399-401; *Wild Sheep*, 681 at 1178.

18       49.    The lack of site-specific geotechnical and mineralogical data in the EA and earlier

19 FEIS leaves unanswered "substantial questions" about the degree of acid drainage risk and

20 whether mitigation measures would actually reduce the impacts to a less than significant level.

21 BLM itself admits in the EA that it could not "make quantitative determinations about the FERC

22 Project's effect on [acid rock drainage]" without the data.  EA at 110.  BLM must prepare an EIS

23 to answer these questions.  *Wild Sheep*, 681 F.2d at 1178; *Blue Mountains*, 161 F.3d at 1212-

24 1216; *LaFlamme*, 852 F.2d at 399-401.

25 ***Groundwater Overdraft***

26       50.    The EA – and the FEIS to which it tiers – ignore "crucial factors" related to the

27 Project's groundwater impacts.  *Wild Sheep*, 681 F.2d at 1178.  For one, the EA fails to provide a

28 reasoned analysis of the impacts of global warming on Project-related groundwater overdraft.

1   While the EA acknowledges that increasing temperatures may increase evaporation rates in the

2   Project area, it fails to quantify the increased evaporation or the resulting increased "need for

3   make-up water supplies" (which could come from increased groundwater pumping). EA

4   Response to Comments at 354. Further, despite the logical fact that reduced surface water

5   supplies from the increased evaporation would also reduce groundwater recharge from that

6   surface water, the EA entirely ignores the impact of increasing temperatures on aquifer recharge

7   rates.

8          51.    In addition, the EA mistakenly relies on a 2013 report by the California Office of

9   Environmental and Human Health Assessment ("OEHHA") to conclude that "[n]o clear

10  precipitation trend is evident in the climate records reviewed by the California EPA," and thus

11  "precipitation is not anticipated to change" in the Project area despite global warming. EA

12  Response to Comments at 353 (first quote), 354 (second quote). But OEHHA's report actually

13  concludes that "southern California" is projected to have a "moderate *decrease*" in precipitation.[1]

14  OEHHA Report at 64 (emphasis added). The EA's description of the baseline hydrologic

15  conditions in the Project area is thus refuted by the very evidence it cites. That refutation

16  precluded an informed analysis of the Project's impacts to the Chuckwalla Valley Groundwater

17  Basin.

18         52.    The EA – and the FEIS to which it tiers – are also flawed as informational

19  documents because they fail to establish the maximum allowable groundwater table change at a

20  well to be used to monitor whether Project-induced drawdown would exceed historic levels. EA

21  Response to Comments at 111; FEIS at 105. NEPA requires BLM to take a "hard look" at

22  groundwater overdraft and acceptable water table drawdown levels *before*, not *after*, Project

23  approval. This EA "represents" the very type of "agency decision to act now and deal with the

24  environmental consequences later" that NEPA forbids. *Wild Sheep*, 681 F.2d at 1181 (holding

25  that agency reliance on even a single future mitigation measure – road closure – that was

26

27  [1]OEHHA's August 2013 Report, "Indicators of Climate Change in California," is
    available online here:

28  https://oehha.ca.gov/media/downloads/risk-assessment/document/climatechangeindicator
    sreport2013.pdf. The EA provides the full citation to the Report on page 150 (Chapter 9).

1    triggered by a future threshold – 40-percent reduction in area use by bighorn sheep – was

2    impermissible "procrastination on environmental concerns").

3    *Wildlife Impacts*

4        53.    "NEPA clearly requires that consideration of the environmental impacts of

5    proposed projects take place *before* any licensing decision is made." *LaFlamme*, 852 F.2d at 400

6    (original emphasis). Yet just as the EA and FEIS impermissibly defer on-site geologic

7    reconnaissance and subsurface investigations, they also impermissibly rely on future biological

8    resources surveys and mitigation measures developed thereon, which likewise preclude the

9    "informed decision-making and informed public participation" that are required *before* agency

10   action. *Block*, 690 F.2d at 761 (quote); FEIS at A-72, A-74, A-80, A-81, A-93, A-94.

11       54.    The FEIS itself "recognize[s] that additional surveys and preparation of mitigation

12   activities would be necessary prior to project construction." FEIS at A-72. Upon Project

13   licensing, Eagle Crest would be required to "conduct thorough, on-the-ground surveys within

14   portions of the project previously inaccessible," including "surveys for sensitive plant species,

15   bats, desert tortoises, and desert tortoise predators." *Id*. And based on those future surveys,

16   Eagle Crest would prepare or amend "mitigation plans for kit fox, badger, bats, raptors, desert

17   tortoise, and desert tortoise predators." *Id.*

18       55.    While the EA included one biological survey completed after the FEIS – the 2016

19   "Desert Tortoise Survey," attached as Appendix B to the EA – that survey did not address any of

20   the other impacted species. Those species require surveys too. Furthermore, even as to the desert

21   tortoise, the 2016 survey was incomplete because it failed to incorporate, or even acknowledge, a

22   second, statutorily-mandated desert tortoise review by an expert agency then underway. FERC –

23   with BLM as a responsible agency – reinitiated Endangered Species Act section 7 consultation

24   with the United States Fish and Wildlife Service ("FWS") in 2016 regarding the desert tortoise.

25   But BLM published the EA in 2017 without waiting for FWS to issue its revised biological

26   opinion later that year. Decision Record 6. Regardless of the biological opinion's conclusions,

27   its omission from the EA precluded the "informed decision-making and informed public

28   participation" required *before* agency action. *Block*, 690 F.2d at 761.

56.     Moreover, because the Desert Tortoise Survey focused on desert tortoises, it understandably did not even attempt to identify numerous other impacted species, like bats, let alone establish their baseline populations and area use.  For those omitted species, like bats, the EA acknowledges that impact analysis and mitigation measure development will rely on *future* surveys.  *E.g.* EA at 26 (the "Wildlife Mitigation Plan, which includes a Bat Protection Plan," includes "provisions for conducting summer and winter baseline bat surveys to determine the existence, location, and condition of bat roosts, and to identify foraging habitat in the Proposed Action area").  Just as in *LaFlamme*, "reliance on a post-licensing study to fully develop a mitigation plan deprives FERC" – and here, BLM too – of "any foundation upon which to base their conclusion that the project's impact . . . will not be significant." 852 F.2d at 400.  BLM must prepare an EIS to answer the "substantial questions" that remain about the Project's impacts on biological resources and the extent to which they could be mitigated.  *Wild Sheep*, 681 F.2d at 1178; *Blue Mountains*, 161 F.3d at 1212-1216; *LaFlamme*, 852 F.2d at 399-401.

***Global Warming***

57.     In determining whether a project will "significantly" affect the quality of the human environment, and thus require preparation of an EIS, the lead agency must consider "both context and intensity." 40 C.F.R. § 1508.27.  Here, the EA and the FEIS on which it relies both fail to take a hard look at how global warming will increase the intensity of other Project impacts, which is a crucial factor to consider before "concluding that [the project] will have no significant impact on the environment." *CBD v. NHTSA*, 538 F.3d at 1215.

58.     For example, the EA fails to provide a reasoned analysis of the impacts of climate change on Project-related groundwater overdraft.  While the EA acknowledges that rising temperatures may increase evaporation rates in the Project area, it fails to quantify the increased evaporation or the resulting increased "need for make-up water supplies" (which could come from increased groundwater pumping).  EA Response to Comments at 354.  Further, despite the logical fact that reduced surface water supplies from the increased evaporation would also reduce groundwater recharge from that surface water, the EA entirely ignores the impact of rising temperatures on aquifer recharge rates.

1    59.    The EA also fails to accurately consider the risk of reduced precipitation – and thus

2 aquifer recharge – from global warming.  It concludes that "[n]o clear precipitation trend is

3 evident in the climate records reviewed by the California EPA," and thus "precipitation is not

4 anticipated to change" in the Project area despite global warming.  EA Response to Comments at

5 353 (first quote), 354 (second quote).  But the OEHHA report on which the EA bases its

6 conclusion actually states that "southern California" is projected to have a "moderate *decrease*"

7 in precipitation.  OEHHA Report at 64 (emphasis added).

8    60.    In addition, the EA – like the FEIS before it – fails to consider whether the

9 Project's impacts on the desert tortoise might be synergistically greater because of the species'

10 increased vulnerability due to global warming.  While the EA recognizes that "global climate

11 change is likely to affect the prospects for the long-term conservation of the desert tortoise and

12 presents a serious risk," it fails to analyze how the Project could cause the desert tortoise

13 relatively more harm under conditions of climate change duress.  EA at 134.  The 2016 Desert

14 Tortoise Survey report does not mention climate change or global warming even once.  EA

15 Appendix B.

16    61.    In sum, the EA and the EIS to which it tiers fail to take a hard look at the impact of

17 climate change on the intensity of other Project impacts.  And to the extent the impacts of climate

18 change are uncertain, that heightens the need for examination of those impacts, and demonstrates

19 even more strongly that BLM must prepare an EIS for the Project.  40 C.F.R. § 1508.27(b)(5).

20 *Cumulative Impacts*

21    62.    The EA and FEIS both fail to include the baseline data essential to taking a hard

22 look at the Project's impacts to biological and other resources.  That failure also precludes an

23 accurate and sufficiently informative analysis of the Project's cumulative biological resource

24 impacts in context with other "past, present, and reasonably foreseeable future actions."  40

25 C.F.R. § 1508.7.

26    **The EA and FEIS Impermissibly Defer Formulation of Mitigation Measures to Avoid or Reduce the Project's Significant Impacts**

27

28    63.    NEPA requires EAs and EISs to describe mitigation measures with sufficient detail

1    to assess how well they "will serve to mitigate the potential harm" they target. *Wild Sheep*, 681

2    F.2d at 1181 (quote); *South Fork*, 588 F.3d at 727. The EA and FEIS here fail to do so because

3    they "rel[y] on . . . post-licensing stud[ies] to fully develop . . . mitigation plan[s]." *LaFlamme*,

4    852 F.2d at 400. That deprived BLM of "any foundation upon which to base [its] conclusion that

5    the project's impact . . . will not be significant," and violates NEPA. *Id*.

6         64.    The lack of *baseline*, *site-specific* data on acid rock drainage and biological

7    resource impacts in the EA and earlier FEIS leaves "substantial questions" about the degree of

8    acid drainage risk and wildlife impacts, and precludes reasoned formulation and analysis of

9    mitigation measures for those impacts. For example, with respect to wildlife impacts, the

10   Project's "Wildlife Mitigation Plan" includes "provisions for conducting summer and winter

11   *baseline* bat surveys to determine the existence, location, and condition of bat roosts, and to

12   identify foraging habitat in the Proposed Action area." EA at 26 (emphasis added). And

13   regarding acid rock drainage impacts, BLM itself admits it could not "make quantitative

14   determinations about the FERC Project's effect on [acid rock drainage]" without the data FERC's

15   license requires Eagle Crest to belatedly collect *after* NEPA review and Project approval. EA at

16   110.

17        65.    FERC's Project license requires "prepar[ing] and implement[ing] plans for

18   conducting site-specific investigations and monitoring programs to protect environmental

19   resources." EA Response to Comments at 112. But as the Ninth Circuit has made clear, "reliance

20   on a post-licensing study to fully develop a mitigation plan deprives" the approval agency of "any

21   foundation upon which to base their conclusion that the project's impact . . . will not be

22   significant." 852 F.2d at 400. "NEPA clearly requires that consideration of the environmental

23   impacts of proposed projects take place *before* any licensing decision is made." *Id*. (original

24   emphasis); *see also Wild Sheep*, 681 F.2d at 1181 (the "absence of . . . crucial information"

25   regarding the quantity of traffic expected after road reopening "renders a decision regarding the

26   sheep's reaction to the traffic on Road 2N06," and a conclusion on the efficacy of the proposed

27   mitigation, "necessarily uninformed"); *Standing Rock Sioux Tribe v. U.S. Army Corps of*

28   *Engineers*, 255 F.Supp.3d 101, 133-134 (D.D.C. 2017) (holding that the Corps' EA for the

1  Dakota Access Pipeline violated NEPA by brushing aside the impacts of an oil spill on fish and

2  game with the assurance that "adherence to Dakota Access's response plan would minimize

3  potential impacts on aquatic wildlife;" internal quotations and citation omitted); *Indigenous*

4  *Environmental Network v. U.S. Department of State*, *supra*, ___ F.Supp.3d ___, 2018 WL

5  5840768 at *10 (agency's deferral of cultural resource surveys for multi-state oil pipeline project

6  violated NEPA); *cf. Minisink Residents for Environmental Preservation and Safety v. FERC*, 762

7  F.3d 97, 112 (D.C. Cir. 2014) (FERC's EA for a natural gas compressor station adequately

8  analyzed property value impacts because it "recognized there may be some adverse impacts on

9  surrounding property," but presented specific "building design and landscaping plans" it

10  concluded "would eventually minimize the visual impact from the station on the surrounding

11  residential properties and would not significantly reduce property values;" internal quotations and

12  citation omitted).

### The FEIS Fails to Analyze and Improperly Dismisses Feasible and Environmentally Superior Alternatives

15  66.  "[C]onsideration of alternatives is critical to the goals of NEPA even when a

16  proposed action does not trigger the EIS process.  This is reflected in the structure of the statute:

17  while an EIS must also include alternatives to the proposed action, 42 U.S.C. § 4332(2)(C)(iii)

18  (1982), the consideration of alternatives requirement is contained in a separate subsection of the

19  statute and therefore constitutes an independent requirement." *Bob Marshall Alliance v. Hodel*,

20  852 F.2d 1223, 1228-1229 (9th Cir. 1988).  Here, BLM in its EA – like FERC in its FEIS – failed

21  to consider a reasonable range of alternatives because they adopted an unreasonably narrow

22  purpose and need for the Project, just as BLM did in its NEPA review of an earlier proposal to

23  use the Project site as a dump. *NPCA*, 606 F.3d at 1070-1072.

24  67.  Numerous commenters on FERC's EIS, including the federal Environmental

25  Protection Agency ("EPA") and Desert Protection Society's predecessor organization (Citizens

26  for the Chuckwalla Valley), recommended that FERC consider a "broader range of alternatives

27  for addressing the needs for peaking capacity, transmission regulation, and use of renewable

28  energy generation (*e.g.* onsite distributed generation, improvements in efficiency, power

1  conservation)." FEIS at A-15. Desert Protection Society made similar recommendations to BLM

2  in its comments on the EA. EA Response to Comments at 105-106. But both FERC and BLM

3  rejected those suggested alternatives as not meeting the agencies' and Eagle Crest's purpose and

4  need for the project. FEIS at A-15; EA Response to Comments at 341.

5        68.    BLM and FERC both made clear that they would limit their EA and EIS

6  alternatives analyses to just the Project "as configured in [Eagle Crest's] license application," and

7  "any alternative configurations" on the same site that "would potentially reduce environmental

8  effects." FEIS at A-15 (quotes); EA Response to Comments at 341. BLM refused to consider

9  "alternatives . . . which include a different Project or means of energy storage" than proposed by

10  Eagle Crest because they "do not meet the purpose and need of the EA." EA Response to

11  Comments at 341 (quotes); 112 ("While different means of generating the same amount of

12  energy, such as rooftop solar facilities, might hypothetically be considered," an "analysis of their

13  environmental effects would not serve to inform our decision about whether to approve the

14  applicant's proposal"). By so narrowly limiting their analysis to alternatives that would meet

15  Eagle Crest's private purpose and need, and hew closely to Eagle Crest's originally proposed

16  Project configuration, BLM "necessarily considered an unreasonably narrow range of

17  alternatives." *NPCA*, 606 F.3d at 1072.

18        69.    It does not matter that FERC had approved the Project before BLM prepared its EA

19  and itself approved the Project. The Project cannot proceed without the gen-tie lines and water

20  pipeline for which BLM approved rights-of-way. BLM is thus not only empowered but under a

21  duty to consider a full range of alternatives to the entire Project, and not segment its review to just

22  the gen-tie lines and water supply pipeline, particularly since FERC also failed to consider a full

23  range of alternatives in its FEIS. 40 C.F.R. § 1508.25(a)(1)(ii); *Native Ecosystems Council v.*

24  *Dombeck*, 304 F.3d at 893-894; *Thomas v. Peterson*, 753 F.2d F.2d 754, 758-759 (9th Cir. 1985);

25  *Sierra Club v. U.S. Department of Energy*, 255 F.Supp.2d 1177, 1184 (D.Colo. 2002).

26                        **NEPA Requires BLM to Prepare Its Own EIS**

27        70.    To correct its NEPA violations, BLM must prepare an EIS rather than simply revise

28  its EA because "substantial questions" remain as to whether the "project may have a significant

1  effect upon the human environment," and those impacts were not thoroughly analyzed in FERC's

2  prior EIS.  *Wild Sheep*, 681 F.2d at 1178 (quotes); FONSI at 3 ("'significant effects that have not

3  been analyzed in an existing EIS will trigger the need for a new EIS;'" quoting BLM NEPA

4  Handbook, H-1790-1, at 69).  As the Interior Department's own NEPA regulations make clear, an

5  EA "may be prepared, and a finding of no significant impact reached, for a proposed action with

6  significant effects *only* if the "EA is tiered to a broader [EIS] which *fully analyzed those*

7  *significant impacts*."  43 C.F.R. § 46.140(c) (emphasis added); *Klamath-Siskiyou*, 387 F.3d at

8  997-998 (holding that EAs for two timber sales on BLM land violated NEPA despite tiering to an

9  EIS for the relevant regional management plan because "[n]either in the RMP-EIS nor in the EAs

10  does the agency reveal" the cumulative effects of logging in the affected watershed).

11      71.      For the foregoing reasons, BLM's approval of the Project violated NEPA and the

12  APA.  Therefore, this Court should set aside BLM's Decision Record as contrary to NEPA and

13  the APA.

14                          **SECOND CLAIM FOR RELIEF**

15                      (BLM's ROW Grant Violated FLPMA and the APA)

16                              (Against All Defendants)

17      72.      The paragraphs set forth above and below are realleged and incorporated herein by

18  reference.

19      73.      The Federal Land Policy Management Act directs that

20      the public lands be managed in a manner that will protect the quality of scientific,
        scenic, historical, ecological, environmental, air and atmospheric, water resource,
21      and archeological values; that, where appropriate, will preserve and protect certain
        public lands in their natural condition; that will provide food and habitat for fish
22      and wildlife and domestic animals; and that will provide for outdoor recreation and
        human occupancy and use.

23

24  43 U.S.C. § 1701(a)(8).

25      74.      FLPMA further requires agencies that are considering applications for rights-of-

26  way to limit to the extent feasible the natural resource damage of the proposed project.  43 U.S.C.

27  § 1765.  FLPMA mandates that "[e]ach right-of-way shall be limited to the ground which the

28  Secretary concerned determines [. . .] will do no unnecessary damage to the environment."  43

1  U.S.C. § 1764(a).  FLPMA also requires that "[e]ach right-of-way shall contain . . . terms and

2  conditions which will . . . minimize damage to scenic and esthetic values and fish and wildlife

3  habitat and otherwise protect the environment."  43 U.S.C. § 1765(a).  These requirements are

4  strictly enforced and cannot be easily counterbalanced by project proponents' claims of

5  inconvenience or cost.  *Trout Unlimited v. U.S. Dept. of Agriculture,* 320 F.Supp.2d 1090, 1108

6  (D. Colo. 2004).

7      75.    Contrary to these mandates, BLM failed to consider terms and conditions that

8  would avoid or reduce the Project's impacts because BLM has not adequately examined and

9  disclosed those impacts.  Unless and until BLM is aware of the Project's impacts, it cannot weigh

10  the benefits of the Project against its harms, as required by FLPMA.  Therefore, BLM's approval

11  of its Decision Record granting the ROW violates FLPMA.

12      76.    FLPMA further mandates that the "Secretary shall manage the public lands under

13  principles of multiple use and sustained yield, *in accordance with the land use plans* . . .

14  developed under [43 U.S.C. section] 1712 . . . when they are available."  43 U.S.C. § 1732(a)

15  (emphasis added).  The Decision Record granting the ROW, however, directly contravenes the

16  standards set forth in the CDCA and the DRECP.

17      77.    Because the Project proposes to locate the gen-tie transmission line and water

18  pipeline in ACECs, DFAs, and GPLs, they must be placed in a designated energy corridor.  EA at

19  1, 5, 8, 22, 23.  Yet BLM's Decision Record approves the gen-tie line and water supply pipeline

20  outside BLM's designated corridors.  *Id.*  Indeed, the EA concedes that the "ROW is not

21  consistent with the CDCA Plan because segments of the gen-tie line and water supply pipeline

22  fall outside of a designated corridor."  EA at 23.

23      78.    BLM admits that an amendment to the CDCA Plan is necessary if the Project is to

24  proceed.  But merely amending the CDCA Plan in the manner proposed does not mean that the

25  Project does not violate other land use standards of the CDCA RMP, nor conflict with the

26  DRECP.  The DRECP and CDCA Plan establish ACECs to "determin[e] what special

27  management certain important environmental resources . . . require, and mak[e] a commitment to

28  provide this management."  CDCA Plan at 101.  "[T]he primary management focus for ACECs is

1   the protection of important cultural and natural resources."  CDCA Plan at 102.  Yet the ROW

2   would allow construction of the gen-tie line and the water supply pipeline right through a DRECP

3   ACEC that is located outside the CDCA designated utility corridor.  EA at 24; FONSI at 1, 6, 8,

4   11.

5       79.   The EA discloses that this incursion into the ACEC includes a "degree of ground

6   disturbance above the designated disturbance cap" for the Chemehuevi to Chuckwalla Linkage

7   Zone.  EA Response to Comments at vii; EA at 7.  The EA states that the CDCA, as amended by

8   the DRECP, requires this ground disturbance to be mitigated through compensatory mitigation in

9   that linkage zone, "unless it is found that no suitable mitigation opportunities exist" within that

10  zone.  EA at 7.  The EA states further that the project proponent "has agreed to voluntarily

11  mitigate for ground disturbance in areas outside [that zone] if no suitable mitigation opportunities

12  exist inside the Chemehuevi to Chuckwalla Linkage zone."  EA at 7.  But nowhere does the EA

13  discuss whether suitable mitigation opportunities exist in the Chemehuevi to Chuckwalla Linkage

14  zone portion of the ACEC.  *Id*.; Decision Record at 10.

15      80.   Furthermore, the Decision Record and impermissibly purports to constrain BLM's

16  own regulatory authority over land use by asserting that "BLM neither can require Eagle Crest's

17  Project to mitigate for ground disturbance in the Linkage Zone if there are no suitable mitigation

18  opportunities within the Linkage zone nor can BLM deny the ROW ('ground disturbance') due to

19  the lack of mitigation opportunities in the Linkage zone because Eagle Crest has a Valid Existing

20  Right to develop the Project."  Decision Record at 10 (citing 43 U.S.C. § 1701(h), 43 C.F.R. §

21  1610.5-3, BLM's Land Use Planning Manual 1601 at .06.G, and BLM's Land Use Planning

22  Handbook H-1601-1 at 19).  The FLPMA section BLM cites applies to valid rights "existing on

23  the date of approval of [FLPMA in 1976]," not subsequently granted by FERC decades later.  43

24  U.S.C. § 1701(a) (emphasis added).  And BLM's Land Use Planning Handbook H-1601-1 (p. 19)

25  merely states that RMPs "will recognize valid existing rights;" it does not command that BLM

26  must issue *new* ROWs to whomever holds those rights.  In any event, even if Eagle Crest had

27  some type of valid existing right to develop the private land portion of the Project site pursuant to

28  FERC's license, it does not have a valid existing right to the ROW over public lands granted by

1  BLM.

2      81.    The purpose of these land use plans is to prioritize the "protection of areas of

3  critical environmental concern." 43 U.S.C. § 1712(c)(3).  And BLM's Decision Record granting

4  the ROW through this important ACEC violates FLPMA.

5      82.    Further, FLPMA requires that ROWs be collocated to the extent practical.  43

6  U.S.C. § 1763 ("the utilization of rights-of-way in common shall be required to the extent

7  practical").  Contrary to this mandate, BLM failed to require collocation of the gen-tie line and

8  water supply pipeline within or alongside the existing energy corridor "to minimize adverse

9  environmental impacts and the proliferation of separate rights-of-way" and to "minimize damage

10  to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment."

11  43 U.S.C. §§ 1763 (first quote), 1765 (second quote).

12      83.    As the FEIS acknowledges, the "CDCA Plan identifies designated utility corridors

13  targeted for transmission lines, pipelines, and related structures such as substations and

14  compression stations and indicates that applications for utility ROWs will be encouraged by BLM

15  management to use designated corridors."  FEIS at 198.  Yet, the "[transmission line] and water

16  supply pipeline routes approved in the FERC license are only partially within a designated

17  [utility] corridor."  EA at 1, 5 (map), 23.

18      84.    "The proposed transmission line would result in the creation of a new utility

19  corridor removed from pre-existing transmission lines."  FEIS at 186.  And doing so would

20  exacerbate the Project's harmful impacts.  Indeed, locating the transmission line outside the

21  designated utility corridor would create greater "disturbance to intact desert tortoise habitat" and

22  "would contribute to incremental erosion of the large open spaces the utility corridors are

23  designed to preserve."  FEIS at 171, 229.  BLM's Decision Record approving the location of the

24  transmission line outside the utility corridor violates FLPMA's mandate for collocation to

25  "minimize adverse environmental impacts."  43 U.S.C. § 1763.

26      85.    While BLM does have ROW permitting authority under Title V of FLPMA and

27  claims that collocation is infeasible, it fails to provide evidence supporting its erroneous

28  infeasibility claim.  EA at 1, 52.  Far from citing evidence of infeasibility, the EA asserts that two

1  alternatives were dismissed merely because they did not provide Eagle Crest with "flexibility to

2  adjust the final footprint of the underground tunnel alignment and powerhouse."  "Flexibility" is

3  not synonymous with feasibility.  EA at 52.  It connotes convenience, not necessity.  Although a

4  third alternative was dismissed ostensibly because the corridor was already full, the EA provides

5  no evidence that this corridor could not be widened to the east.  EA at 51.  Without this

6  information, BLM could not determine that alternative routes that met the collocation

7  requirement were infeasible.  Nor could it adequately weigh the Project's resource impacts

8  against alternatives.  Accordingly, BLM did not comply with FLPMA's collocation requirement.

9       86.    For the foregoing reasons, BLM's approval of the Project's right-of-way violated

10  FLPMA and the APA.  Therefore, this Court should set aside BLM's Decision Record as contrary

11  to FLPMA and the APA.

12                          **THIRD CLAIM FOR RELIEF**

13                   (BLM's LUPA Violated FLPMA and the APA)

14                        (Against All Defendants)

15       87.    The paragraphs set forth above and below are realleged and incorporated herein by

16  reference.

17       88.    BLM's LUPA similarly violates FLPMA's mandate that

18       the public lands be managed in a manner that will protect the quality of scientific,
         scenic, historical, ecological, environmental, air and atmospheric, water resource,
19       and archeological values; that, where appropriate, will preserve and protect certain
         public lands in their natural condition; that will provide food and habitat for fish
20       and wildlife and domestic animals; and that will provide for outdoor recreation and
         human occupancy and use.

21

22  43 U.S.C. § 1701(a)(8).

23       89.    As discussed above, BLM has failed to examine and disclose the impacts of the

24  Project.  This informational vacuum fails to satisfy FLMPA's requirements that BLM "consider

25  [the] relative scarcity of the values involved and the availability of alternative means . . . and sites

26  for the realization of those values," and "weigh the long-term benefits to the public against the

27  short-term benefits."  43 U.S.C. § 1712(c)(6), (7).  Unless and until BLM is aware of the

28  Project's impacts – whether short-term or long-term – it cannot weigh the benefits of the Project

1    against its harms, as required by FLPMA.  *Id.*  Therefore, BLM's LUPA does not comport with

2    FLPMA and its implementing regulations, and cannot remedy the plan inconsistencies that this

3    Project creates.

4        90.    Additionally, the LUPA itself is inconsistent with FLPMA.  BLM states in its

5    Project approvals that FERC's license for the Project, issued in June 2014, precludes BLM from

6    examining alternatives that fail to "recognize the [Federal Power Act] withdrawal of these lands

7    and the issuance of a License for the Project."  *E.g.*, EA Response to Comments at 297 (citing16

8    U.S.C. § 818; 43 U.S.C. § 1714(I)).  This withdrawal, however, does not preclude BLM from

9    examining alternative transmission routes or other alternatives that reduce the Project's impacts,

10   consistent with FLPMA's requirements and the applicable resource management plans.  *See* 43

11   U.S.C. § 1712; 43 C.F.R. § 1610.6-3(a).  Yet here, BLM shirked its responsibility under the guise

12   of deference to FERC.  FLPMA requires more.

13       91.    BLM has a duty to independently "weigh long-term benefits to the public against

14   short-term benefits," "consider the relative scarcity" of the resources that will be impacted, and

15   ensure that ACECs are given priority when considering land use plan amendments such as the

16   LUPA. 43 U.S.C. § 1712(c).  The LUPA allows the Project's transmission lines and water

17   pipeline to cross through the Chuckwalla ACEC outside of the CDCA-designated utility corridor,

18   and thus fails to "give priority to the . . . protection of areas of critical environmental concern." 43

19   U.S.C. § 1712(c)(3).  Yet BLM is required to "make operations and activities . . . conform to the

20   plan components" of the CDCA "within a reasonable period of time."  43 C.F.R. § 1610.6-3(b).

21   While this requirement is "subject to valid existing rights," this does *not* prevent BLM from

22   requesting a reroute of the Project's proposed transmission and pipelines to comport with the

23   CDCA, since that request does not extinguish Eagle Crest's FERC license.

24       92.    BLM dismisses the Project's incursion into the Chuckwalla ACEC in areas outside

25   the utility corridor on the theory that the FERC license predates the DRECP's CDCA Plan

26   amendment that designated this area as an ACEC.  *See, e.g.*, EA Response to Comments at 297.

27   But BLM fails to discuss why it cannot route the pipeline and transmission lines along the nearby

28   existing utility corridor.  *See* EA Response to Comments at 423 (discussing why the pipeline and

1    transmission lines must be within the ACEC, but not why they were not moved to nearby existing

2    utility corridors). BLM incorrectly claims that the Project complies with the conservation

3    management actions ("CMA") established by the DRECP on the grounds the Project's "gen-tie

4    line crosses the Chuckwalla ACEC *primarily* in an area that is also within a CDCA-designated

5    utility corridor." *See* EA Appendix A at 46, 49-50, 54 (emphasis added). But that claim ignores

6    the fact that portions of the Project also fall *outside* the CDCA-designated utility corridor. *See*

7    EA Figure 1-2. BLM claims that the FERC license will "satisfy the resource management goals

8    of the DRECP" regarding the use of designated utility corridors even though it does not confine

9    the transmission lines to those corridors. *Id.*, *see also* EA Appendix A at 12, 46-47, 61. BLM

10   has failed to give priority to the ACEC, in violation of FLPMA. 43 U.S.C. § 1712(c)(3).

11       93.    BLM's failure to adequately mitigate the Project's "degree of ground disturbance

12   above the designated disturbance cap" for the Chemehuevi to Chuckwalla Linkage Zone likewise

13   violates FLPMA. EA Response to Comments at vii; EA at 7. As discussed above, the CDCA

14   requires this ground disturbance to be mitigated through compensatory mitigation in that same

15   linkage zone, unless "no suitable mitigation opportunities exist." EA at 7. But the EA does not

16   even address whether suitable mitigation opportunities exist in the Chemehuevi to Chuckwalla

17   Linkage Zone portion of the ACEC. *Id.*; Decision Record at 10.

18       94.    FLPMA mandates that "[i]n managing the public lands the Secretary shall . . . take

19   any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. §

20   1732(b). Contrary to this mandate, the LUPA approves energy transmission through ACECs,

21   DFAs, and GPLs, *outside* the designated corridor. The CDCA Plan Amendment's allowance of

22   widespread, intensive energy development on these fragile, irreplaceable desert lands violates

23   FLPMA because it needlessly degrades invaluable public resources within the Planning Area.

24       95.    For all of these reasons, BLM's LUPA violates FLPMA and the APA and must be

25   set aside.

26                          **FOURTH CLAIM FOR RELIEF**

27       ( BLM's Dismissal of Desert Protection Society's Protest Violated FLPMA and the APA)

28                              (Against All Defendants)

1    96.    The paragraphs set forth above and below are realleged and incorporated herein by

2  reference.

3    97.    Pursuant to FLPMA, 43 U.S.C. § 1711(a), BLM promulgated 43 C.F.R. 1610.5-2,

4  to provide for a one-stage protest process for review of public objections to its resource

5  management plans.  43 C.F.R. 1610.5-2.  BLM's regulations for protests to its land planning

6  decisions provide that a protest letter must set forth, among other requirements, "[a] concise

7  statement explaining why the [BLM] State Director's decision is believed to be wrong."  43

8  C.F.R. 1610.5-2 (1983).

9    98.    On May 17, 2017, the Desert Protection Society submitted a protest letter,

10  appealing the adoption of the LUPA,  pursuant to 43 C.F.R. section 1610.5-2 (1983).  The Desert

11  Protection Society's protest raised objections to the LUPA on the grounds that the amendment

12  was based on deficient environmental reviews that violate NEPA and FLPMA.  It pointed out that

13  BLM's EA, on which the LUPA was based, tiered to FERC's inadequate 2012 FEIS.  Among

14  other problems, the FEIS failed to address substantial changes to the Project's size and location

15  and new information documenting more severe impacts that has been recently obtained through

16  updated surveys and consultation.

17    99.    In response, BLM's then California State Acting Assistant Director Steve Tryon

18  issued a decision summarily dismissing plaintiff's protest on August 1, 2018, claiming that it

19  allegedly failed to contain a short statement "explaining why the State Director's decision is

20  believed to be wrong."  Yet, plaintiff's letter clearly contains such a statement.  Defendants'

21  dismissal of plaintiff's protest was arbitrary and capricious because the Desert Protection

22  Society's protest clearly did satisfy the requirements of the applicable regulation.  Accordingly,

23  BLM lacked grounds for dismissing the Desert Protection Society's protest for failing to fulfill

24  that requirement.  If BLM now contends that the protest was deficient in some other, unstated

25  way, then BLM's dismissal fails to provide, as required, an adequate explanation of BLM's

26  reasons for dismissing the protest.  BLM's dismissal of the protest was therefore arbitrary and

27  capricious and contrary to the governing regulation, in violation of FLPMA and the APA.

28    100.    BLM dismissed the remainder of the Desert Protection Society's protest based on

the erroneous claim that "the BLM California State Director followed the applicable laws, regulations, and policies and considered all relevant resource information and public input in developing the Eagle Crest EA and CDCA Plan Amendment." But that conclusion does not follow from the arguments and information presented in the August 1, 2018 Protest Resolution Report on which BLM relies. Indeed, the Protest Resolution Report discusses only two of plaintiff's grounds for protest – ineffective mitigation measures and climate change. And neither of those discussions is adequate to support dismissal of the protest. For example, the Protest Resolution Report merely recaps the inadequate discussion of mitigation measures in the FEIS and EA – and ignores the grounds advanced in plaintiff's protest. Protest Resolution Report at 43-45. BLM's reiteration of its impermissibly deferred plans and untested, speculative mitigation measures without any discussion of the shortcomings detailed in plaintiff's protest fails to address those shortcomings, let alone remedy them.

101. The Protest Resolution Report's discussion of climate change is similarly devoid of support. Protest Resolution Report at 49-50. Rather than address the EA's inadequacies, BLM attempts to sidestep its responsibilities by claiming that it "need not speculate" about "issues that are [not] truly significant to the action in question." *Id.* BLM's failure to provide evidence and law to support its summary denial of the Desert Protection Society's protest violates FLPMA.

102. For the foregoing reasons, BLM's dismissal of the Desert Protection Society's protest violated FLPMA and the APA. Accordingly, this Court should set aside BLM's dismissal of plaintiff's protest and BLM's subsequent approval of the LUPA and the Eagle Crest Project as contrary to FLPMA and the APA.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment against the defendants as follows:

1. Adjudge and declare that BLM's April 2017 approval of the CDCA Land Use Plan Amendment and Decision Record granting the Right-of-Way for the Project violate NEPA, FLPMA, and the APA;

2. Order BLM to withdraw and set aside its Project approvals, including its LUPA approval and ROW grant, until such time as it has complied with the requirements of NEPA,

FLPMA, and their implementing regulations;

  3.  Preliminarily and permanently enjoin BLM from initiating or permitting any activities in furtherance of the Project that could result in any alteration of the physical environment unless and until the defendants comply with the requirements of NEPA, FLPMA, and their implementing regulations;

  4.  Award plaintiff its reasonable attorneys' fees and costs and expenses incurred in connection with the litigation of this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, or as otherwise provided by law; and

  5.  Order any other relief that this Court deems just and proper.


Dated: January 31, 2019    Respectfully submitted,

             /s/ STEPHAN C. VOLKER
             STEPHAN C. VOLKER
             Attorney for Plaintiff DESERT PROTECTION
             SOCIETY