1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DESERT PROTECTION SOCIETY,              No. 2:19-cv-00198-DJC-CKD

12              Plaintiffs,

13        v.                                 ORDER

14   DEBRA HAALAND, in her official
     capacity as Secretary of the United
15   State Department of the interior, et al.

16              Defendants,

17   and

18   EAGLE CREST ENERGY COMPANY,
     INC.
19
                Defendant-Intervenor.
20

21        This case deals with the Bureau of Land Management's ("BLM") decision to

22   amend the California Desert Conservation Area Plan and grant a right-of-way to

23   Intervenor-Defendant, Eagle Crest Energy Company to "construct, operate, maintain,

24   and decommission a gen-tie [electrical] line and water supply pipeline" (the "Right-of-

25   Way Project") necessary for a pumped storage electrical generation project (the

26   "Energy Project").  The Energy Project was approved and licensed by the Federal

27   Energy Regulatory Commission ("FERC") in 2014, and the Right-of-Way Project was

28   approved in 2018.  Plaintiff, the Desert Protection Society, has brought this suit

                                        1

1   contending that BLM violated the National Environmental Policy Act and the Federal

2   Land Policy Management Act, and has thereby violated the Administrative Procedure

3   Act in its assessment and grant of the right-of-way.  While it is apparent that Plaintiff

4   disagrees with FERC's assessment and approval of the underlying Energy Project, this

5   Court is limited to reviewing whether BLM acted in an arbitrary or capricious manner

6   or violated the relevant statutes and regulations in its assessment and approval of the

7   Right-of-Way Project, not FERC's assessment of the Energy Project.

8           Each party – Plaintiff, Defendants, and Intervenor-Defendant – has filed a Cross

9   Motion for Summary Judgement.  (Pl.'s Mot. (ECF No. 27-1), Defs.' Mot. (ECF No. 30),

10  Int. Def.'s Mot. (EFC No. 31-1).)  For the reasons below, Defendants' and Intervenor-

11  Defendant's Motions for Summary Judgement are GRANTED in full, and Plaintiff's

12  Motion for Summary Judgement is DENIED.

13  **I.        Background**

14          In 2014, FERC approved and licensed to Eagle Crest Energy Company ("Eagle

15  Crest") the Energy Project, a large-scale pumped storage electrical generation project

16  which repurposes a defunct mine near Joshua Tree National Park in Southern

17  California.  (Int. Def.'s Mot. at 9–10.)  The Energy Project is licensed to operate for at

18  least 50 years with the potential for renewal.  (*Id.* at 11.)  FERC completed a

19  comprehensive Environmental Impact Statement ("EIS") assessing the impacts of the

20  Energy Project, including the portions of the project that would be on BLM-managed

21  land, and various mitigation measures as part of its approval process.  (Defs.' Mot. at

22  2.) Plaintiff intervened in the FERC proceedings, submitted comments on the EIS and

23  sought a rehearing of the project's license in 2014, but ultimately did not seek timely

24  judicial review of the license.  (*Id.* at 7.)

25          After the Energy Project was licensed, Eagle Crest sought a right-of-way from

26  BLM to access and construct the required gen-tie line and water pipeline on land that

27  FERC had withdrawn for Eagle Crest's use pursuant to the Federal Power Act, but

28  which was managed by the BLM.  (Int. Def.'s Mot. at 11.)  While the impacts of the

utility lines and the proposed right-of-way were already assessed in FERC's EIS, BLM prepared an Environmental Assessment which incorporated (or "tiered to") the FERC EIS, but conducted further, more detailed assessment of the impacts of the right-of-way specifically.  (Int. Def.'s Mot. at 11–12; Admin. R. ("A.R.") 015467.)  After completing the Environmental Assessment, BLM concluded that the right-of-way would not have a significant impact on the environment, and therefore determined an EIS for the Right-of-Way Project was not necessary.  (Int. Def.'s Mot. at 12.)  Instead, BLM issued a Finding of No Significant Impact on August 1, 2018.  (*Id.*)

In the intervening period between the Energy Project approval and BLM's assessment of the Right-of-Way Project, BLM's California Desert Conservation Area Plan ("California Conservation Plan") was amended by the Desert Renewable Energy Conservation Plan ("Renewable Energy Plan").  The Renewable Energy Plan established Areas of Critical Environmental Concern ("Area(s) of Critical Concern") and conservation and management actions for certain land uses in the California deserts.  (*See* Pl.'s Mot. at 35); U.S. Bureau of Land Mgmt., *Desert Renewable Energy Conservation Plan* 42, 90–92 (2016).  Part of the right-of-way granted to Eagle Crest runs through an Area of Critical Concern that was designated under the Renewable Energy Plan after FERC approved the Energy Project and withdrew lands for the associated utility lines.  (Pl. Mot. at 35.)  Ordinarily, pursuant to the Renewable Energy Plan, any utility lines running through this region would need to be routed through a designated utility corridor.  However, the utility corridor was full, and the siting of the FERC licensed project would not allow for the use of a different utility corridor.  (Pl.'s Mot. at 31; Defs.' Mot. at 26–27.)  To address this inconsistency, BLM amended the relevant land use plan, the California Conservation Plan, to allow a portion of the right-of-way to exist outside of the designated utility corridor.  (Pl.'s Mot. at 12.)  The California Conservation Plan amendment was assessed within the Environmental Assessment for the Right-of-Way Project.  (A.R.  015480–82.)

1  On May 17, 2017, Plaintiff submitted a protest letter in response to the

2  proposed plan amendment.  (Pl.'s Mot. at 36.)  BLM issued an individualized response

3  letter to Plaintiff on August 1, 2018, and directed Plaintiff to the Protest Resolution

4  Report it issued the same day.  (A.R. 010417, 004434.)  The Protest Resolution Report

5  included individual responses to two of the issues Plaintiff raised, as well as responses

6  to issues raised by other parties.

7  On August 1, 2018, BLM issued a Decision Record approving the plan

8  amendment and granting the right-of-way.  (A.R. 010425–26.)

9  On September 17, 2018, Plaintiff filed an administrative appeal challenging

10  BLM's Decision Record and a Petition to Stay BLM's decision with the Interior Board of

11  Land Appeals ("Appeals Board").  (Int. Def.'s Mot. at 13.)  On November 26, 2018, the

12  Appeals Board denied Plaintiff's Petition to Stay, and Plaintiff moved to dismiss its

13  appeal on January 31, 2019 before the Appeals Board reached a decision on the

14  merits.  (*Id*.)  The Appeals Board removed the appeal from its docket on February 16,

15  2019.  (*Id*.)  Plaintiff filed the instant case the same day it withdrew its appeal on

16  January 31, 2019.  (Compl. (ECF No.1).)

17  **II.    Legal Standard for Motion for Summary Judgement**

18  Ordinarily, summary judgment is appropriate under Rule 56 where the moving

19  party "shows that there is no genuine dispute as to any material fact and the movant is

20  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  However, "[i]n a case

21  involving review of a final agency action under the Administrative Procedure Act . . .

22  the standard set forth in Rule 56(c) does not apply because of the limited role of a

23  court in reviewing the administrative record."  *Sierra Club v. Mainella*, 459 F. Supp. 2d

24  76, 90 (D. D.C. 2006).  "A court conducting APA judicial review does not resolve

25  factual questions, but instead determines 'whether or not as a matter of law the

26  evidence in the administrative record permitted the agency to make the decision it

27  did.'"  *Conservation Cong. v. U.S. Forest Serv.*, No. 2:12-CV-02800-TLN, 2014 WL

28  2092385, at *4 (E.D. Cal. May 19, 2014) (quoting *Mainella*, 459 F. Supp. 2d at 90).  In a

4

1   case brought under the Administrative Procedure Act ("APA"), summary judgment is

2   the "mechanism for deciding, as a matter of law, whether the agency action is

3   supported by the administrative record and otherwise consistent with the APA

4   standard of review." *Conservation Cong.*, 2014 WL 2092385, at *4.

5          Because the National Environmental Policy Act ("NEPA") and the Federal Land

6   Policy Management Act ("FLMPA") – the statutes which Plaintiff alleges Defendants

7   violated – do not allow a private right of action, the agency's decisions will be

8   reviewed under the APA. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d

9   1233, 1238 (9th Cir. 2005). Under the APA, a decision may be set aside if it is

10  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

11  *Id.*; 5 U.S.C. § 706(2)(A). Such review "is narrow and a court is not to substitute its

12  judgment for that of the agency." *Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto.*

13  *Ins. Co.*, 463 U.S. 29, 43 (1983). Accordingly, a court may only set aside a decision if

14  the agency "has relied on factors which Congress has not intended it to consider,

15  entirely failed to consider an important aspect of the problem, offered an explanation

16  for its decision that runs counter to the evidence before the agency, or is so

17  implausible that it could not be ascribed to a difference in view or the product of

18  agency expertise." *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir.

19  2010) (quoting *State Farm*, 463 U.S. at 43).

20  **III.    Discussion**

21         Plaintiff brings two sets of claims, the first alleging that BLM's Environmental

22  Assessment failed to comply with NEPA, and therefore the agency's finding that the

23  Right-of-Way project would have no significant environmental impact was arbitrary

24  and capricious, and second, that BLM's approval of the land use plan amendment and

25  right-of-way failed to comply the FLMPA, rendering those decisions violative of the

26  APA.

27  ////

28  ////

### A. Compliance with NEPA Requirements

Plaintiff contends that BLM violated NEPA by failing to prepare a separate EIS for the right-of-way approval.  Plaintiff alleges that BLM improperly relied on the EIS prepared by FERC because that report was deficient, and because the Environmental Assessment prepared by BLM did not adequately supplement or address the deficiencies in the EIS.

At the outset, the Court notes that the Council on Environmental Quality conducted a major overhaul of the regulations implementing NEPA in 2020, which were later revised in May 2022.  Both amendments occurred after BLM conducted its environmental assessment and issued its decision.  Because the previous regulations were controlling at the time BLM conducted its assessment, the Court will refer to the then-existing regulations and requirements, which may or may not be requirements under the current regime.  A copy of the relevant historical regulations is appended to this opinion.

Under NEPA, a federal agency must prepare an EIS when they propose to undertake "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.1; *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 575 (9th Cir. 1998).  To determine whether an EIS is needed, an agency will first prepare an Environmental Assessment to assess whether the project will have a significant effect on the environment, thereby requiring an EIS. See 40 C.F.R. §§ 1501.4(b), 1508.9.  Where "substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor," an EIS is required.  *LaFlamme v. FERC*, 852 F.2d 389, 397 (9th Cir.1988) (internal quotations omitted).  If the agency instead determines there will be no significant impact, the agency will issue a Finding of No Significant Impact and is not required to issue an EIS.  *Morongo*, 161 F.3d at 575.

An agency's determination about the proposed project's impact, and whether an EIS is required, is reviewed under the arbitrary and capricious standard.  Federal

6

courts are limited to only reviewing whether the agency "has taken the requisite 'hard look' at the environmental consequences of its proposed action" and "whether the agency decision is 'founded on a reasoned evaluation of the relevant factors.'" *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992) (quoting *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 373–74, 378 (1989) (internal quotations omitted)).  If the Environmental Assessment "fail[s] to address certain crucial factors, consideration of which was essential to a truly informed decision whether or not to prepare an EIS" the decision not to issue an EIS will be considered arbitrary and capricious. *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agr.*, 681 F.2d 1172, 1178 (9th Cir. 1982).  The decisions about whether to create an EIS is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1177 (9th Cir. 1990) (quoting *Marsh*, 490 U.S. at 374).

While an agency must take a "hard look" at the environmental consequences of a project, it may "tier to [or incorporate] an EIS that reflects such analysis." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 896 (9th Cir. 2002).  "In general, an agency preparing an environmental assessment for a [lesser] permit is not required to reevaluate the analyses included in the relevant project's EIS." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 511 (D.C. Cir. 2010).   The essential question before the Court is whether BLM took a "hard look" at all the factors relevant to the proposed right-of-way and sufficiently supplemented the FERC EIS in areas where the EIS did not address the particular impacts of the right-of-way.

### i.  Analysis of Environmental Impacts

### 1.  Decommissioning

Plaintiff asserts that as part of the agency's requirement to assess mitigation measures, BLM must create a create a specific decommissioning plan and analyze the impacts of decommissioning activities.  NEPA requires an agency to discuss mitigation measures with "sufficient detail to ensure that environmental consequences have

1  been fairly evaluated." *S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't*

2  *of Interior*, 588 F.3d 718, 727 (9th Cir. 2009) (quoting *Robertson v. Methow Valley*

3  *Citizens Council*, 490 U.S. 332, 352 (1989)).  "There is a fundamental distinction,

4  however, between a requirement that mitigation be discussed in sufficient detail to

5  ensure that environmental consequences have been fairly evaluated, on the one hand,

6  and a substantive requirement that a complete mitigation plan be actually formulated

7  and adopted, on the other."  *Robertson*, 490 U.S. at 353.

8  　　　The level of detail required is dependent on the certainty of the environmental

9  impacts.  *See Okanogan Highlands All. v. Williams*, 236 F.3d 468, 477 (9th Cir. 2000)

10  (finding that mitigation measures described in more general terms were adequate

11  where the adverse environmental impacts were uncertain).  NEPA "does not require

12  an agency to consider the possible environmental impacts of less imminent actions."

13  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976); *Kentucky Coal Ass'n, Inc. v.*

14  *Tennessee Valley Auth.*, 68 F. Supp. 3d 703, 714 (W.D. Ky.), *aff'd*, 804 F.3d 799 (6th

15  Cir. 2015)  (not requiring a detailed decommissioning plan "[b]ecause the timing and

16  manner of the decommissioning of the coal units are indefinite," and it was therefore

17  "proper for TVA to analyze retirement of the units separately from their possible

18  decommission in the future.").

19  　　　The cases cited by Plaintiff in support of its position deal with potential

20  mitigation for imminent environmental impacts.  *See S. Fork Band Council*, 588 F.3d at

21  727 (holding that NEPA required BLM to assess whether the drying up of water

22  resources could be avoided); *Wild Sheep*, 681 F.2d at 1181 (failing to assess whether

23  a three-month road closure period would mitigate the harm to sheep rearing).

24  However, the Energy Project is licensed for 50 years with the potential for renewal, so

25  will not be decommissioned for at least 50 years, and the right-of-way associated with

26  the Energy Project has a corresponding lifespan.  Plaintiff fails to point to any case

27  where an agency was required to assess detailed mitigation measures for an action

28  *////*

1    that would be taken as far in the future as the decommissioning of this project would

2    occur.

3         *Sierra Club v. Clinton*, cited by Defendants, is more instructive given the

4    comparably long lifespan of the project at issue in that case (at least 50 years) and the

5    similar level of uncertainty about the environmental conditions and regulations at the

6    time of decommissioning.  746 F. Supp. 2d 1025, 1046–47 (D. Minn. 2010).  In *Sierra*

7    *Club*, the District Court for the District of Minnesota concluded that a general

8    abandonment plan was reasonable given the long lifespan of the project.  *Id.*  The

9    agency had required that "[a]bandonment plans would be submitted to the

10   appropriate agencies for review and approval prior to abandonment of the pipelines .

11   . . and would be responsive to regulations that are in place at the time."  *Id.* at 1047.

12   The agency also minimally considered current regulations stating that "[c]urrent

13   regulations require that oil pipelines be emptied and cleaned prior to abandonment."

14   *Id.*  From that, the assessment concluded that "agencies with jurisdiction may also

15   require that a pipeline be filled with sand or that it be removed and the corridor be

16   restored to conditions acceptable to the applicable resource agencies."  *Id.*

17        Plaintiff attempts to differentiate *Sierra Club* by pointing to the agency's

18   discussion of then-current regulations and arguing that BLM failed to discuss current

19   regulations.  But that discussion did not carry the day in *Sierra Club*.  The agencies in

20   the *Sierra Club* case did not provide a high level of detail about the current

21   regulations or prescribe any action based on the current regulations.  Instead, the

22   court appeared to hold that it was enough that the agency required future

23   abandonment to comply with applicable laws at the time decommissioning would be

24   carried out.

25        Here, the Energy Project and Right-of-Way Project will similarly be subject to yet

26   unknown regulations given its at least 50-year lifespan.  The Environmental

27   Assessment provides an even more detailed decommissioning plan than the plan in

28   *Sierra Club*, and also requires compliance with the laws that will exist at the time of

1    decommissioning.  Upon the project's closure, BLM would require:

2            all components of the system [] be recycled to the extent
             feasible.  The components would be deconstructed and
3            recycled or disposed of safely in accordance with
             contemporary practices and regulations applicable at the
4            time of decommissioning, and the Proposed Action area
             could be converted to other uses in accordance with
5            applicable land use regulations in effect at the time of
             closure . . . .

6            [In addition] the FERC Project Decommissioning Plan for
             BLM-managed lands would address:
7
     •    Proposed decommissioning and reclamation measures for
8         the FERC Project and associated facilities

9    •    Activities necessary for site restoration/re-vegetation of
          developed areas, if removal of equipment and facilities is
10        needed

11   •    Procedures for reuse, recycling, or disposal of facility
          components; collection and disposal of hazardous wastes;
          and use or disposal of unused chemicals
12
     •    Costs associated with the planned decommissioning
13        activities and the source of funding for these activities

14   •    Conformance with applicable laws, ordinances, regulations,
          and standards.

15   (A.R. 01528–29.)

16        The outlines of this decommissioning plan provide sufficient discussion of the

17   mitigation measures that will be taken upon decommissioning such that impacts have

18   been "fairly evaluated" given the at least 50-year lifespan of the projects, and the

19   uncertainty of the applicable laws at the yet-to-be-determined time of

20   decommissioning.  It is reasonable for BLM to instead prepare a more detailed plan

21   based on the conditions at the time of closure.  Requiring any more detail at the

22   current juncture would be an exercise in speculation at best and could undermine

23   more appropriately tailored future measures at worst.

24                          **2.  Acid Rock Drainage**

25        Plaintiff next asserts that BLM's assessment of potential acid rock drainage and

26   the potential effects of seismic activity on acid rock drainage was inadequate because

27   FERC required that Eagle Crest conduct future studies on those impacts, thereby

28   leaving unanswered questions about the environmental impact.  Because the FERC

                                        10

1   EIS was allegedly deficient in this regard, Plaintiff asserts that it was not appropriate

2   for BLM to rely on the EIS, and that BLM should have conducted additional

3   investigation into the impacts of acid rock drainage.

4          While the EIS developed by FERC is, upon review, likely deficient in its analysis

5   of acid rock drainage because it failed to take samples or conduct studies to

6   determine whether the site contained sulfides that would cause acid production and

7   openly admitted that its findings were "speculative,"[1] acid drainage is not implicated

8   in BLM's narrower Right-of-Way Project.  Plaintiffs do not assert that the right-of-way

9   grant for the transmission lines will cause the seepage that may lead to acid drainage,

10  instead it is water flowing in the reservoir of the larger FERC approved project that

11  might cause the acid drainage.  Further, the potential seepage would not occur on

12  BLM land, and Plaintiff does not assert that such drainage would have an effect on

13  BLM land.  It is unclear why BLM would be required to assess the impacts of a different

14  project outside of the scope of the project it is analyzing and occurring on lands not

15  managed by BLM.  *Cf. Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d

16  754, 763 (9th Cir. 1996) (agency not required to assess impacts on areas adjacent to

17  the project).  Rather, it appears that Plaintiff's challenge is to FERC's analysis of the

18  Energy Project, which is not at issue here, and which Plaintiff is time-barred from

19  directly challenging.

20         Plaintiff attempts to rely on *Klamath-Siskiyou Wildlands Center v. Bureau of*

21  *Land Management* and *Native Ecosystems Council v. Dombeck* for the proposition

22  that an agency must supplement an EIS that does not fully assess the impacts of a

23  project.  *Klamath-Siskiyou Wildlands Center v. Bureau of Land Management,* 387 F.3d

24  989, 997–998 (9th Cir. 2004); *Dombeck*, 304 F.3d at 895–896.  However, both cases

25

26  [1] The EIS acknowledges that "specific measurements of the mineralogy and toxic metal content of the
    material that would come into contact with project waters have not been conducted.  Without samples
27  to determine the amount of pyrite and other sulfides in the largely inactive mine pits, the extent of acid
    production is speculative."  (AR 017882.).  FERC also noted that "[q]uantitative information to determine
28  if acid production would occur during project operations does not exist."  (AR 017880.)

are readily distinguishable.  In *Klamath-Siskiyou* BLM failed to assess the *specific* impacts of the narrower logging project on BLM managed land which was not addressed in the broader Regional Management Plan EIS.  By contrast, in the present case, Plaintiffs are asserting that BLM needed to address an issue not related to the specific project assessed by BLM, and not occurring on BLM managed lands.  In *Dombeck*, the Forest Service was required to analyze the cumulative impacts of future, additional road density amendments which were all proposed for the same national forest.  304 F.3d at 896–897.  The agency in that case was required to assess the impacts of a project on lands it managed and of other projects it oversaw.  *Id.*  It was not required to assess the impacts of adjacent projects managed by a different agency, as the Plaintiff asserts BLM was required to do here.

Plaintiff's reliance on *LaFlamme* for the argument that agencies cannot conduct post-licensing studies is similarly misplaced.  In *LaFlamme*, the court found that the agency's complete failure to prepare an environmental assessment and conduct any pre-licensing studies violated NEPA.  *LaFlamme*, 852 F.2d at 399–400.  This is not the situation here.  Despite FERC's failure to conduct adequate pre-licensing studies, BLM did not fail to prepare an Environmental Assessment or to complete studies relevant to the impacts of the right-of-way.

In sum, Plaintiff points to no authority requiring an agency to correct a different agency's EIS that it has tiered to where the insufficient portions of the EIS are not related to the principal agency's specific project.  Because Plaintiff does not assert that BLM failed to assess potential acid drainage effects of the Right-of-Way Project this claim must fail.

### 3.  Groundwater Overdraft

Plaintiff next contends that the BLM Environmental Assessment and the EIS failed to address the effects of global warming on groundwater.  Plaintiff asserts that BLM failed to analyze how a decrease in precipitation would impact groundwater recharge and how global warming may increase evaporation, stating it is a "logical

12

1    fact that reduced surface water supplies from the increased evaporation would also

2    reduce groundwater recharge from that surface water." (Pl.'s Mot. at 23.)  However,

3    Plaintiff does not specify how the project at issue – the right-of-way – would have an

4    impact on the groundwater supply.  In the Finding of No Significant Impact, BLM

5    states that "[w]hile the [Environmental Assessment] included additional analysis of

6    water quality/quantity impacts, the Proposed Action itself would not directly result in

7    these impacts." (A.R. 018566.)  Any groundwater usage will result from the Energy

8    Project, not from the Right-of-Way Project.   But despite not being required to, BLM

9    did conduct additional analysis on the Energy Project's impacts on groundwater.

10         BLM tiered to the groundwater assessment present in the FERC EIS, but also

11   supplemented its analysis by reviewing more up-to-date information on climate

12   change, and by conducting a revised water balance calculation because of the change

13   in the number of other projects which would utilize water.  (A.R. 010303–04, 015609–

14   10.)  BLM acknowledges that the initial reservoir filling will result in short-term

15   groundwater overdraft, but that in the long term the Energy Project will not cause the

16   aquifer to be over drafted because recharge of the basin is expected to exceed

17   withdrawals for the majority of the 50-year license period.  (A.R. 015585).  In fact, in its

18   supplemental assessment, BLM found that the FERC project is likely to be less

19   impactful than FERC initially predicted because there will be fewer additional projects

20   utilizing water than previously thought.  (A.R. 015609–10.)

21         Additionally, BLM found that despite global warming, annual precipitation is

22   not anticipated to change, and groundwater recharge is therefore also not anticipated

23   to change.  (A.R. 010303–04.)  Precipitation in Southern California is already highly

24   variable, and BLM found that there was no clear precipitation trend evident in the

25   climate records.  (*Id.*)  Plaintiff attempts to undercut BLM's assessment by pointing to a

26   2013 study by the California Office of Environmental Health Hazard Assessment

27   ("OEHHA") that indicated Southern California would experience a "moderate

28   decrease" in precipitation.  OEHHA, *Indicators of Climate Change in California*, 64

(2013).  BLM addressed this study and concluded that the projection showed "little change in total annual precipitation" and that there was not a "clear precipitation trend." (A.R. 016343.)

Although BLM does not quantify the potential increase in evaporation referenced in the Response to Comments, BLM does address the need for make-up water supplies due to evaporation.  (A.R. 010304, 010264–65.)  BLM notes that the amount of water which will be needed to make up for evaporation is comparatively minimal with respect to the groundwater supply, (see A.R. 010265), and ultimately concluded that groundwater recharge was not anticipated to change.  (A.R. 010304.)  There was no need for BLM to conduct further inquiry into the potential increased evaporation due to global warming after concluding the Right-of-Way Project would have no significant impact on groundwater regardless of evaporation.

### 4.  Wildlife Impacts

Next, Plaintiff asserts that BLM failed to fully address the impact the Right-of-Way Project would have on wildlife.  Specifically, Plaintiff argues that BLM was required to conduct surveys on the potential impacts on additional species before the Right-of-Way Project's approval, and that the study BLM did on the desert tortoise was deficient because BLM failed to wait for a Fish and Wildlife Services review to be completed.  Plaintiff separately argues that BLM failed to account for the impacts of global warming on desert tortoise habitat as well.

The animals which Plaintiff asserts BLM has failed to investigate (bats, desert tortoise, kit fox, badgers, raptors, and desert tortoise predators) are either animals which have potential to be impacted by the Energy Project, not by the right-of-way, or animals for which the FERC EIS had assessed the impact of the right-of-way.  With respect to bats, BLM stated in its Response to Comments that bat roosting would be impacted by the use of the water pits as part of the Energy Project.  (A.R. 10250.)  There is nothing on the record that shows bats would be impacted by the right-of-way grant or the utility lines.  As discussed above in Section III.A.i.2, BLM does not have an

obligation to assess the impacts of a different project, only the impacts of the specific proposed project which it is analyzing.

For kit foxes, badgers, and other burrowing animals like the burrowing owl which are known to be present in the right-of-way area, FERC assessed the impact of construction on burrows and developed a mitigation plan which would be effective for the right-of-way at issue.  (A.R. 017950–52.)  In tiering to the FERC analysis which assessed the impact of the specific BLM Right-of-Way Project in addition to the Energy Project, BLM sufficiently met the NEPA requirements.

Both BLM and FERC addressed the utility lines' impacts on raptors, including a potential for collision with conductors or electrocution, but also an increase in nesting habitat which may lead to increased predation of desert tortoises.  (A.R. 17953.)  FERC required Eagle Crest to comply with standards to make transmission lines safer for raptors and other birds.  (*Id.*)  Further, FERC determined that locating the transmission lines near to pre-existing lines would limit the new nesting because they will be in territory already claimed by raptors.   (A.R. 017954.)  BLM tiered to FERC's analysis and reiterated these potential impacts in the Environmental Assessment as well.  (A.R. 015575–77.)

BLM thoroughly assessed the project's impacts on the desert tortoise, both tiering to the FERC EIS, and conducting its own updated survey on the desert tortoise.  Not only did FERC conduct multiple surveys analyzing the right-of-way's impact on the desert tortoise, which BLM tiered to, but BLM conducted an updated comprehensive survey on the desert tortoise in 2016, which it included with the Environmental Assessment.  (*See* A.R. 015536–39, 015739–800.)

Plaintiff attempts to argue that BLM violated NEPA by not waiting for the results of an amended U.S. Fish and Wildlife Service ("Fish and Wildlife") Biological Opinion regarding the Project's impacts on wildlife, which was initiated as an inter-agency consultation between FERC and BLM under section 7 of the Endangered Species Act.
////

1  (A.R. Doc. No. 247.)[2]  Plaintiff's argument fails because neither the Endangered

2  Species Act (which Plaintiff has not alleged BLM violated) nor NEPA requires that an

3  agency wait for the results of a Biological Opinion before finalizing an Environmental

4  Assessment.[3]  The Endangered Species Act only requires that following the issuance

5  of the Biological Opinion, the cooperating agency "determine whether and in what

6  manner to proceed with the action" and "notify the [Fish and Wildlife] Service of its

7  final decision on the action."  50 C.F.R. § 402.15.  BLM fully complied with this

8  requirement by issuing a letter to Fish and Wildlife stating that the Biological Opinion

9  did not alter its determination of the Right-of-Way Project's impacts, and stating that

10  BLM would commit to systematic avian mortality monitoring.  (A.R. 000632–33.)  This

11  letter was sent before BLM made a final decision on the right-of-way.  (A.R. 010430.)

12      Further, to the extent that Plaintiff is arguing that BLM did not have adequate

13  information without the Biological Opinion, this argument too fails.  NEPA only

14  requires that an agency utilize *existing* information where that information adequately

15  addresses the impacts of the proposed action and where there were no "new

16  circumstances, new information or changes in the action or its impacts not previously

17  analyzed [which] may [have] result[ed] in *significantly different* environmental effects."

18

19  [2] Fish and Wildlife initially issued a Biological Opinion for the FERC Energy Project in 2012.  (A.R.
20  010430.)  In 2016, BLM requested that it be added to the Opinion as a cooperating agency, and FERC
    requested that Fish and Wildlife re-initiate consultation on the Biological Opinion and include BLM as
21  cooperating agency.  (*Id.*)  On March 3, 2017, Fish and Wildlife notified the agencies that it would need
    to conduct additional analysis on the impact to bird populations.  (A.R. Doc. No. 247.)  Later that year,
    on October 30, 2017, Fish and Wildlife issued an amended Biological Opinion.  (*See* A.R. 010430.)
22  BLM responded to the Opinion stating that, based on the information included in the Biological
    Opinion, BLM continued to consider the risks and impacts of the Right-of-Way Project to be
23  insignificant.  (A.R. 000632–33.)  BLM also addressed the Biological Opinion in its Decision Record
    granting the right-of-way, issued in August 2018.  (A.R. 010430.)
24  [3] Plaintiff asserts that BLM acknowledged and committed to waiting for Fish and Wildlife to complete
    the Biological Opinion before issuing a decision but abandoned that position without explanation.
25  (Pl.'s Opp'n. (ECF No. 34) at 14.)  This assertion is mischaracterized and incorrect.  In the Protest Report,
    which was issued *after* the Environmental Assessment, BLM stated that it would "complete that Section
26  7 ESA consultation and expects the [Fish and Wildlife Service] to issue a Biological Opinion before the
    BLM makes a final decision on whether to amend the [California Conservation] Plan and issue the [right-
27  of-way]."  (A.R. 004480.)  BLM did in fact follow through with this and waited for the completion of the
    Biological Opinion before issuing its final decision.  The Biological Opinion was issued on October 30,
28  2017, and the Decision Record was issued in August of 2018.  (A.R. 010430.)

1   43 C.F.R. § 46.120 (emphasis added).  Since BLM had just completed its own survey of

2   the Project's impacts on the desert tortoise, and had reasonably relied on the surveys

3   conducted by FERC as to the avian impacts and other wildlife impacts, BLM based its

4   environmental assessment on existing and adequate information.  Moreover, the

5   Biological Opinion did not alter BLM's assessment of the Project's impacts, indicating

6   there was no new information that would have resulted in "significantly different"

7   impacts.  (*See* A.R. 000632–33, 010430.)

8          Finally, Plaintiff asserts that FERC did not conduct sufficient analysis in its EIS –

9   and thus BLM's reliance on the EIS was improper – because FERC ordered additional,

10  pre-construction but post-licensing surveys.  Plaintiff again attempts to rely on

11  *LaFlamme* which states that "consideration of the environmental impacts of proposed

12  projects [must] take place *before* any licensing decision is made."  (Pl.'s Mot. at 24

13  (quoting  *LaFlamme*, 852 F.2d at 400).)  For similar reasons that *LaFlamme* was

14  inapplicable as to the pre-construction acid-drainage studies, *supra* Section III.A.i.2, it

15  is also inapplicable here.  In *LaFlamme*, the agency failed to conduct *any* pre-licensing

16  studies.  Here, not only did FERC assess the impacts of the right-of-way on the desert

17  tortoises, but BLM conducted an additional survey on the desert tortoise in 2016.

18  BLM did therefore consider the environmental impacts of the project before it granted

19  the right-of-way.  Moreover, the post-licensing surveys were ordered not to establish

20  baseline information about the impact of construction on wildlife, but are part of the

21  mitigation plan to ensure that no burrowing animals, including desert tortoises, are

22  present in the area at the time of construction.  (A.R. 015567 (citing A.R. 017970 (FERC

23  Final EIS), and A.R. 009818 (the Desert Tortoise Clearance and

24  Relocation/Translocation Plan).)  Eagle Crest must conduct pre-construction clearance

25  surveys to identify whether tortoises are present so that they can be removed before

26  fencing is installed to exclude the tortoises.  The additional clearance surveys are not

27  for the purpose of understanding the environmental impact but are to be used in

28  mitigating that impact.  (*See* A.R. 009818.)

17

BLM satisfactorily assessed the project's impacts on wildlife by both tiering to the FERC EIS which addressed the impacts, and by supplementing the EIS with a new study on the desert tortoise and other burrowing animals which may be impacted by the project.

### 5. Global Warming

Plaintiff argues that BLM has a duty to address the "intensity" of proposed actions, and therefore had a duty to separately address the way global warming might intensify the effects of the Project.  Accordingly, Plaintiff asserts that BLM failed to address how global warming would lead to increased groundwater overdraft and would compound the Project's impact on desert tortoise habitat.  However, Plaintiff misunderstands what NEPA requires.  NEPA requires that an agency must assess the impacts of *the project* on the environment, not the other way around.  *See* 40 C.F.R. § 1508.1.

Plaintiff does not contend that the Right-of-Way Project will have any effect on or increase global warming.  Instead, Plaintiff asserts that global warming would increase the other impacts of the project.  To the extent that Plaintiff is alleging Defendants have failed to address how global warming will intensify the project's impacts on groundwater overdraft and wildlife, the sufficiency of BLM's analysis is addressed above.

### 6. Cumulative Impacts

In addition to analyzing the specific impacts of a proposed project, agencies must also assess the "cumulative impacts" of the project with other "past, present, and reasonably foreseeable future actions."  40 C.F.R. §1508.7; §1508.25  *Inland Empire*, 88 F.3d at 764.  Plaintiff has failed to state which other projects BLM failed to take into account when determining the cumulative impacts of the project at issue.  Ostensibly, BLM had an obligation to assess the cumulative impacts of the Right-of-Way Project and other projects in the immediate area, including the larger FERC Energy Project. ////

1       BLM devotes Chapter Six of the Environmental Assessment to cumulative

2   impacts resulting from the development of the FERC Energy Project, as well as

3   residential and agricultural groundwater use, the Colorado River Aqueduct, and

4   proposed solar and wind energy developments.  (A.R. 015607.)  BLM assessed the

5   cumulative effects on air quality and climate change, water quality and quantity,

6   wildlife, land use recreation, cultural resources, and visual resources.  (A.R. 015607–

7   20.) The agency tailored the physical boundary of its analysis for each resource to

8   better account for potential cumulative effects that may occur outside of the

9   immediate vicinity of the project area, and BLM looked at the scope of the effects 50

10  years out.  (A.R. 015607–08.)

11      Plaintiff does not point to a particular area that BLM omitted or insufficiently

12  analyzed.  Instead, Plaintiff argues that because the other assessments which Plaintiff

13  had identified were allegedly deficient, so too must the cumulative effects assessment

14  be deficient.  As discussed above, BLM's other impact assessments satisfied NEPA's

15  requirements.  Where the cumulative effects analysis is "fully informed and well

16  considered," the agency is entitled to deference, as it is with the other conclusions it

17  has made about the Right-of-Way Project's impacts.  *See All. for the Wild Rockies v.*

18  *Pena*, No. 2:16-cv-294-RMP, 2018 WL 4760503, at *12 (E.D. Wash. Oct. 2, 2018).

19  Because Plaintiff cannot assert, and the Court cannot identify, any deficiency in BLM's

20  knowledge base or analysis, the Court finds the cumulative impacts assessment was

21  reasonable and satisfactory under NEPA.

22                    **ii.  Analysis of Mitigation Measures**

23      As part of the analysis on the impact of the project, NEPA requires that

24  agencies describe measures that will be taken to mitigate the environmental impact of

25  projects and assess how those mitigation measures will work.  *See Wild Sheep*, 681

26  F.2d at 1180–81; *Greenpeace*, 14 F.3d at 1330–31.  In the environmental assessment,

27  BLM did list mitigation measures it would take.  It incorporated the Natural Resource

28  Protection Plans which were required by the FERC license.  (A.R. 015493-96.)  BLM

19

1  also listed mitigation measures for each of the potential environmental impacts in

2  Chapter Four of the Environmental Assessment.  For each environmental

3  consequence of the proposed action, BLM lists mitigation measures and the impacts

4  those measures will have, including measures to mitigate the impacts on wildlife like

5  the desert tortoise and bighorn sheep, and on water quantity and quality.  (A.R.

6  015562–94.)

7      Plaintiff's argument that BLM failed to analyze potential mitigation measures is

8  basically rehashing its argument that because FERC ordered some post-licensing

9  studies, BLM necessarily could not have understood the impacts of the Project or the

10  effects of potential mitigation measures.  Specifically, Plaintiff points to BLM's alleged

11  failure to conduct pre-licensing studies about the potential for acid drainage and the

12  effects on roosting bats.  However, as the Court addressed above, both of these are

13  impacts that the Energy Project may potentially have, but not impacts which the Right-

14  of-Way Project might have.  *See supra* Sections III.A.i.2 and III.A.i.4.  Because these

15  impacts are outside the scope of the Right-of-Way Project, BLM had no obligation to

16  either conduct baseline studies or to develop mitigation measures to address these

17  impacts.  While Plaintiff may believe that FERC should have conducted these studies

18  and developed different mitigation measures for the Energy Project, those arguments

19  are not relevant to the analysis of BLM's actions with respect to the Right-of-Way

20  Project.

21      **iii.  Consideration of Alternative Means**

22      In assessing the environmental impact of a project, an agency must also assess

23  alternatives to the project.  40 C.F.R. §1502.14.  Agencies need not discuss every

24  conceivable alternative, only those that are "reasonable" alternatives which meet the

25  project's stated needs and goals.  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d

26  190, 196 (D.C. Cir. 1991), *cert. denied*, 502 U.S. 994, 112 (1991).  "[NEPA] does not

27  require agencies to analyze the environmental consequences of alternatives it has in

28  good faith rejected as too remote, speculative, or . . . impractical or ineffective."  *All*

20

1   *Indian Pueblo Council v. United States*, 975 F.2d 1437, 1444 (10th Cir. 1992).  "What is

2   required is information sufficient to permit a reasoned choice of alternatives as far as

3   environmental aspects are concerned."  *Id.*

4         Plaintiff asserts that BLM impermissibly narrowed the scope of the Project's

5   purpose by "segment[ing] its review to just the gen-tie lines and water supply

6   pipeline," and should have instead considered a "broader range of alternatives for

7   addressing the needs for peaking capacity, transmission regulation, and use of

8   renewable energy generation (e.g., onsite distributed generation, improvements in

9   efficiency, power conservation)."  (Pl.'s Mot. at 28.)  In other words, Plaintiff argues

10   that BLM should have assessed alternatives to the Energy Project.  BLM counters that

11   the Project was limited to the proposed right-of-way, and therefore only alternatives

12   that met the purpose of the right-of-way could be considered.  BLM defines the

13   purpose and need of the project as being "to respond to a FLPMA ROW application

14   submitted by Eagle Crest, to construct, operate, maintain, and decommission a gen-

15   tie line and water supply pipeline on public lands administered by the BLM in

16   compliance with the FLPMA, BLM [right-of-way] regulations, and other applicable

17   federal laws and policies."  (A.R. 015486.)  As such, BLM argues that the range of

18   alternative energy projects proposed by Plaintiff were not relevant to the project

19   which BLM was assessing.

20         Although "[a]gencies enjoy 'considerable discretion' to define the purpose and

21   need of a project . . . an agency cannot define its objectives in unreasonably narrow

22   terms."  *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058,

23   1070 (9th Cir. 2010) (quoting *Friends of Southeast's Future v. Morrison*, 153 F.3d

24   1059, 1066 (9th Cir. 1998) and citing *City of Carmel-By-The-Sea v. United States*

25   *Dep't. of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997)).  "An agency may not define

26   the objectives of its action in terms so unreasonably narrow that only one alternative

27   from among the environmentally benign ones in the agency's power would

28   accomplish the goals of the agency's action, and the EIS would become a

foreordained formality." *Friends*, 153 F.3d at 1066 (quoting *Burlington*, 938 F.2d at 196).  Instead, the purpose of the project must be described in a manner which discusses "the [agency]'s purpose and need, against the background of a private need, in a manner broad enough to allow consideration of a reasonable range of alternatives." *Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1071.  Agencies must acknowledge the needs and goals of the parties involved in the application, but also the agency's statutory authorization to act and the views of congress.  *See Burlington*, 938 F.2d at 196.  A court's review of an agency's purpose statement should be governed by a "rule of reason."  *Id.*; *accord Friends*, 153 F.3d at 1067.  Whether a purpose statement is reasonably circumscribed is specific to the mandates of the agency at issue and the particular facts of each case.

In *National Parks & Conservation Association v. BLM*, the Ninth Circuit found that the BLM's purpose and need statement was unreasonably defined by the private interests of the applicant.  The stated goals of the project were "(1) to meet long-term landfill demand; (2) to provide a longterm income source from a landfill; (3) to find a viable use for mine byproducts; and (4) to develop long-term development plans for the Townsite." *National Parks & Conservation Association*, 606 F.3d at 1071.  While the first goal was undoubtedly a BLM purpose, the remaining goals would have provided benefit to the applicant only because it would have been the recipient of any income and would have received a fee interest from the townsite development.  *Id.*  Further, BLM had no need to find a use for mine byproducts which occurred on the applicant's private land.  *Id.*  Because of the focus on the applicant's private needs, BLM only considered alternatives that would have all resulted in the creation of the landfill on the applicant's property and did not consider other alternatives to address the need to meet long-term landfill demand.  *Id.* at 1072.

In contrast, in *Friends of Southeast's Future v. Morrison*, the Ninth Circuit found that the BLM's purposes statement was reasonable where it took into consideration the agency's goals and regulatory framework.  The stated goals were "(1) to

implement Forest Plan direction for the Project Area; (2) to help meet market demand for timber in Southeast Alaska; and (3) to move toward the desired future condition for the Project Area by harvesting mature stands of suitable timber and replacing them with faster growing, managed stands of second growth timber, capable of long-term timber production . . . ." *Friends*, 153 F.3d at 1067. There BLM's reference to the Forest Plan incorporated BLM's goals of balancing the wilderness, fish, and wildlife protection with the need to meet timber demand. *Id.* By describing the purpose of the project in terms of the agency's goals and not just the applicant's, the agency was able to consider reasonable alternatives that met these goals.

Agencies can reasonably circumscribe their purpose statements even further, and focus more on the goals of the applicant, where the circumstances call for a limited purpose. In *Colorado Environmental Coalition v. Dombeck*, the Tenth Circuit found that an agency's purpose statement – which was limited to the consideration of alternatives that would meet the goal of the applicant's recreation development – was reasonable because the land had already been designated for winter recreation development. 185 F.3d 1162, 1175 (10th Cir. 1999). The agency subsequently only reviewed alternatives which "varied primarily in the amount and type of additional skiable terrain and related amenities to be developed, and, consequently, in the type and degree of environmental impacts each would impose." *Id.* Despite the agency's focus on the applicant's goals, the alternatives considered were reasonable because the land had already been restricted to certain types of development. *See id.*

Here, BLM limited the stated need and purpose to "respond[ing] to a FLPMA ROW application submitted by Eagle Crest, to construct, operate, maintain, and decommission a gen-tie line and water supply pipeline on public lands administered by the BLM in compliance with the FLPMA, BLM ROW regulations, and other applicable federal laws and policies." BLM also states that:

> [i]n accordance with FLPMA of 1976 Section 103(c), public lands are to be managed for multiple uses, taking into account the long-term needs of future generations for

1
2
3

> renewable and non-renewable resources. The Secretary of the U.S. Department of the Interior (Interior) is authorized to grant ROWs on public lands '. . . for systems for generation, transmission, and distribution of electric energy. . . .' (FLPMA Section 501[a][4]).

4   (A.R. 015486.)

5       Like the Forest Service in *Dombeck*, here BLM was constrained in the purpose

6   of the project by an outside factor; it was not considering an otherwise uninhibited

7   project proposal like the one at issue in *National Parks & Conservation Association*.

8   The Energy Project had already been approved by FERC and BLM's role was limited to

9   determining whether and where to grant a right-of-way for the transmission lines.

10  Further, BLM included in its purpose statement its need for compliance with

11  applicable land use plans and the agency's goals and mandate to balance multiple

12  uses of the public lands, similar the purpose statement in *Friends*.  Unlike *National*

13  *Parks & Conservation Association*, the purpose articulated by BLM is not focused only

14  on the private interest at stake, but also BLM's own stated goals and policies, such as

15  authorizing grants for projects which generate, transmit, and distribute electric

16  energy.  Although the narrow scope of the purpose statement necessarily limited the

17  alternatives BLM considered, such a limited purpose was not unreasonable in light of

18  the extenuating circumstances.

19      It would have been unreasonable for BLM to address other potential energy

20  projects which would have been alternatives to the FERC approved Energy Project

21  because those would not have been alternatives to the right-of-way at issue.  "When

22  the purpose is to accomplish one thing, it makes no sense to consider the alternative

23  ways by which another thing might be achieved."  *City of Angoon v. Hodel*, 803 F.2d

24  1016, 1021 (9th Cir. 1986).  The alternative energy projects proposed by Plaintiff

25  would plainly not have addressed the needs of the Right-of-Way Project.  Those

26  alternatives would have more properly applied to a challenge of the FERC Energy

27  Project.

28

1    In its review of alternatives, BLM considered several alternatives which it

2  ultimately did not analyze in detail because the agency considered them not feasible

3  or practical.  *See* 40 C.F.R. §1502.14(a).  "[W]hereas with an EIS, an agency is required

4  to '[r]igorously explore and objectively evaluate all reasonable alternatives,' see 40

5  C.F.R. § 1502.14(a), with an Environmental Assessment, an agency only is required to

6  include a brief discussion of reasonable alternatives.  *See* 40 C.F.R. § 1508.9(b)."  *Ctr.*

7  *for Biological Diversity v. Salazar*, 695 F.3d 893, 915 (9th Cir. 2012) (quoting *N. Idaho*

8  *Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008)).

9  For alternatives which are eliminated from further inquiry, the agency is only required

10  to "briefly discuss the reasons for their having been eliminated."  40 C.F.R.

11  §1502.14(a).  Under this standard, the Court finds BLM's review of the alternatives in

12  its Environmental Assessment was compliant with NEPA.

13    BLM considered, but eliminated from further analysis, four alternatives to the

14  proposed action.  (A.R. 015530.)  First, BLM determined that that the gen-tie line could

15  not be collocated in the corridor adjacent to the Desert Sunlight Solar Farm's gen-tie

16  line because the corridor was full with other existing or future gen-tie lines and would

17  need to be physically expanded to include the Eagle Crest gen-tie line.  (A.R. 015530.)

18  BLM determined that this corridor could not be widened because it both ran through

19  a California Desert National Conservation Land, which only allowed gen-tie lines in

20  designated corridors, and through an Area of Critical Concern.  (*Id.*)  In addition, BLM

21  considered collocating the gen-tie line and water supply pipeline through the

22  California Conservation Plan designated corridor.  It determined this option was not

23  viable because it would require crossing additional environmentally sensitive lands

24  including National Conservation Lands, Areas of Critical Concern, and Joshua Tree

25  National Park.  (*Id.*)  It also found that the utility corridor was unsuitable for the

26  waterline because the line connected three specific wells that were located on private

27  land outside the corridor.

28

1    The final two alternatives that BLM excluded from further consideration were

2    limiting the right-of-way to the lands included within the boundary of the FERC-

3    licensed Energy Project[4] and limiting the right-of-way to the lands included within the

4    original right-of-way application and not the modified application.[5]  (*Id.*)  BLM

5    rejected these alternatives because they failed to provide "some limited flexibility to

6    adjust the final footprint . . . in response to the final engineering and geotechnical

7    consideration."  (*Id.*)  BLM further reviewed the six right-of-way alternatives addressed

8    but dismissed FERC in the EIS and agreed with FERC's analysis.  (A.R. 015531–32.)

9    BLM ultimately only considered in detail the proposed action with terms and

10   conditions which BLM imposed (its "preferred alternative"), and a "no action"

11   alternative.  The Ninth Circuit has upheld the review of only two alternatives, with one

12   being the preferred action and the other being no action, as reasonable and

13   compliant under NEPA.  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d

14   1233, 1246 (9th Cir. 2005) ("The statutory and regulatory requirements that an agency

15   must consider 'appropriate' and 'reasonable' alternatives does not dictate the

16   minimum number of alternatives that an agency must consider."); *see also Salazar*, 695

17   F.3d at 915 (upholding agency's decision to only examine in detail the preferred and

18   no action alternatives in the Environmental Assessment); *N. Idaho Cmty.*, 545 F.3d at

19   1154 (same).  Based on this precedent, BLM's consideration of the preferred

20   alternative and no action alternative satisfies the requirements of NEPA.

21                                           ***

22   The Court finds that BLM complied with NEPA and did not act arbitrarily or

23   capriciously in determining that the Right-of-Way Project would have no significant

24   impact based on the agency's Environmental Assessment.  The assessment took the

25   _____

26   [4] The right-of-way would necessarily include additional land around the boundary of the FERC-licensed energy project consistent with Eagle Crest's need to access and construct the transmission lines.

27   [5] The original right-of-way application submitted by Eagle Crest identified more acreage than its modified application, which Eagle Crest states was intended to "allow for evaluation of alternatives and refinements in project design to avoid potential impacts to environmental or cultural resources."  (Int.

28   Def.'s Mot. at 9, n.1.)

1  requisite "hard look" at the potential impacts of the Project, mitigation measures, and

2  alternatives.  Accordingly, the Court GRANTS summary judgement to Defendants and

3  Intervenor Defendant on Plaintiff's First Claim for Relief.

4     **B. Adherence to the FLMPA in the Plan Amendment and Right-of-Way**

5        **Grant**

6        Plaintiff presents interrelated arguments concerning the plan amendment and

7  the right-of-way grant under the FLMPA.  As an initial matter, all Parties agree that the

8  proposed right-of-way was not consistent with the prior land use plan developed by

9  BLM because the right-of-way fell outside of the designated utility corridor.  (*See* Pl.'s

10  Opp'n. at 31; Defs.' Mot. at 30; Int. Def.'s Mot. at 37.)  They also agree that BLM had

11  the authority to amend the plan under 43 C.F.R. section 1610.5–3 (c) and did amend

12  the plan to make it consistent with the right-of-way grant.  (Pl.'s Opp'n. at 31.)

13  However, Plaintiff contends that the amendment and subsequent right-of-way grant

14  were nonetheless in violation of the FLMPA for four separate reasons: (1) the

15  amendment and right-of-way conflicted with other land use standards under the

16  California Conservation Plan as amended by the Renewable Energy Plan; (2) BLM did

17  not have sufficient information to weigh the balance of interests as required by the

18  FLMPA due to BLM's alleged failure to properly assess the Project; (3) BLM did not

19  issue appropriate mitigation measures; and (4) BLM's decision to not require that

20  Eagle Crest collocate the utility lines within the designated utility corridor was contrary

21  to its mandate.

22          **i.  Land Use Standards**

23        BLM is required to "manage the public lands . . . in accordance with the land

24  use plans developed by [the Secretary] under section 1712 of this title when they are

25  available . . . ."  43 U.S.C. § 1732(a).  The California Conservation Plan is the relevant

26  land use plan with which BLM must comply.  In the interim period between when the

27  FERC Energy Project was approved and when Eagle Crest applied for a right-of-way

28  with BLM, the California Conservation Plan was amended by the Renewable Energy

1   Plan to include strengthened protections for some areas of the California desert.

2   Under the amended plan, the Right-of-Way Project was not compliant.  BLM

3   addressed this conflict by approving a concurrent project-specific amendment to the

4   land use plan, which it assessed in the same Environmental Assessment, and

5   approved in the same Decision Record, as the right-of-way itself.  While the parties

6   agree that the right-of-way complies with the land use plan as amended by the project

7   specific amendment, Plaintiff argues that the right-of-way continues to conflict with the

8   standards under the California Conservation Plan as amended by the Renewable

9   Energy Plan.  (*See* Pl.'s Opp'n. at 31.)

10   In 2016, the California Conservation Plan was amended by the Renewable

11   Energy Plan, which provided new or strengthened protection for certain areas,

12   including Areas of Critical Concern.  Under 43 U.S.C. § 1712(c)(3), BLM is required to

13   "give priority to the designation and protection of areas of critical environmental

14   concern" when amending plans.  The right-of-way allows Eagle Crest to construct

15   transmission lines through an area of land that was designated as an Area of Critical

16   Concern under the Renewable Energy Plan, and would disturb that area "above the

17   designated disturbance cap." (A.R. 10158, 15486).  Plaintiff argues that despite the

18   project specific plan amendment, the right-of-way still needs to comply with the

19   Renewable Energy Plan, which it does not, and that the project-specific amendment

20   conflicts with the Renewable Energy Plan's instruction to give priority to Areas of

21   Critical Concern.  Defendants argue that because FERC withdrew and granted a

22   license to the lands for the right-of-way before the Renewable Energy Plan was

23   implemented, Eagle Crest had a valid existing right to the right-of-way which pre-

24   dates the Renewable Energy Plan.  Therefore, Defendants argue, the Renewable

25   Energy Plan regulations are inapplicable or unenforceable to the extent they would

26   interfere with Eagle Crest's valid existing right.

27   There is disagreement among the Parties about whether the FERC license for

28   the Energy Project and FERC's set aside of lands for the water pipeline and gen-tie

28

line created a valid existing right to the right-of-way which was exempt from the Renewable Energy Plan Amendment.  The FLMPA states that "[a]ll actions by the Secretary concerned under this Act shall be subject to valid existing rights."  PL 94–579 (S 507), October 21, 1976, 90 Stat 2743, Sec. 701 43 USC 1701 note (h).  Plaintiff argues that this language means that the FLMPA only exempts rights that existed before the FLMPA was enacted in 1976.  However, BLM promulgated a regulation pursuant to this section of the FLMPA which requires that the implementation of any "approved or *amended*" plan would be "subject to valid existing rights."  43 C.F.R. § 1610.5–3(b) (emphasis added).  BLM's regulation necessarily contemplates that rights which are acquired at *any* point could be exempted from subsequent plans or amendments.

The FLMPA is not explicit about whether it only exempts rights created before 1976.  When implementing a statutory scheme, an agency must necessarily create policy to "fill any gap left, implicitly or explicitly, by Congress."  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)).  And when an administrative agency does so, the courts are required under *Chevron* to defer to the agency's reasonable "construction of a statutory scheme it is entrusted to administer."  *Id.*  Here, by promulgating 43 C.F.R. § 1610.5–3(b), BLM construed the FLMPA to create exemptions for rights that are acquired at any point.  The Court finds that the BLM's construction is reasonable.  If BLM had adopted Plaintiff's interpretation that the FLMPA only exempted rights existing in 1976, it would mean that any project or action approved since then in the last nearly 50 years could be upended every time a land use plan is approved amended.  Not only would such a reading undermine the licenses granted to use federal lands, but it would also be unworkable for BLM to reassess already-approved projects and issue new licenses with new mitigation measures every time a plan was amended.

BLM further interpreted its own regulation to determine that the land withdrawn pursuant to the FERC license constituted such a valid existing right.  (A.R.

1   015594, 015595 n. 11.)  In the Renewable Energy Plan, BLM defined a valid existing

2   right as a "documented, legal right or interest in the land that allows a person or entity

3   to use said land for a specific purpose . . .  includ[ing] fee title ownership, mineral

4   rights, rights-of-way, easements, permits, licenses, etc.  [whether] reserved, acquired,

5   leased, granted, permitted, or otherwise authorized over time."  U.S. Bureau of Land

6   Mgmt., *Desert Renewable Energy Conservation Plan* 42, xxiv (2016).  The

7   Environmental Assessment states that BLM determined the FERC license issued to

8   Eagle Crest and the lands withdrawn by FERC fit within this broad definition.  (A.R.

9   015504.)

10      BLM's interpretation of its own regulation is entitled to deference under

11  *Auer/Seminole Rock.  See Auer v. Robbins*, 519 U. S. 452 (1997); *Bowles v. Seminole*

12  *Rock & Sand Co.*, 325 U. S. 410 (1945).  Under *Auer*, if a regulation is subject to

13  multiple reasonable interpretations, courts will defer to the agency's reasonable

14  interpretation of their own regulation.  *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2410–18

15  (2019) (reaffirming *Auer* deference and explaining its application).  Both Plaintiff's and

16  BLM's interpretation of what constitutes an "existing right" are reasonable: on the one

17  hand, Plaintiff's interpretation that the right-of-way was not a then-existing right is

18  reasonable because the right-of-way itself was granted by BLM after the Renewable

19  Energy Plan went into effect.  On the other hand, BLM's interpretation that Eagle Crest

20  had a preexisting right to implement the FERC licensed project on the lands

21  withdrawn by FERC is also reasonable.  The Energy Project approval and license gave

22  Eagle Crest a documented interest in undertaking to build and operate the project,

23  and the right-of-way is a necessary part of that license.  Of particular note, FERC

24  withdrew, and granted Eagle Crest a license to use, the specific lands BLM adopted

25  for the right-of-way (A.R. 010429), which thus created an "interest in the land that

26  allows a person or entity to use said land for a specific purpose."  Eagle Crest had an

27  interest in the use of that land for the specific purpose of running the required utility

28  lines for the Energy Project, and this interest was documented and approved by FERC.

1    Eagle's Crest's interest therefore easily – and reasonably – fits into the type of interest

2    recognized as a valid existing right, and the Court defers to BLM's reasonable

3    interpretation of its regulation.

4         Because Eagle Crest had a valid existing right, BLM could not impose

5    Renewable Energy Plan regulations to the extent they would interfere with that right,

6    and instead could only impose regulations that were in effect at the time the FERC

7    license was granted, because the Renewable Energy Plan was "subject to" Eagle

8    Crest's valid existing right.  (A.R. 015594.)  However, BLM did impose conservation

9    management actions which were not included in the original FERC license to the

10   extent that they did not interfere with Eagle Crest's ability to exercise its existing right.

11   (A.R. 015594, 015595 n. 11.)  In addition, BLM and Eagle Crest came to an agreement

12   that Eagle Crest would voluntarily comply with mitigation opportunities in the Area of

13   Critical Concern that otherwise would not apply to it.

14        The Court finds that BLM complied with the relevant land use standards when

15   amending the land use plan and granting the right-of-way because Eagle Crest had a

16   valid existing right which exempted it from the otherwise inconsistent Renewable

17   Energy Plan land use standards.

18                    **ii.  Balance of Interests**

19        In revising or amending a plan, BLM is required to "weigh long-term benefits to

20   the public against short-term benefits," and "consider the relative scarcity of the values

21   involved."  43 U.S.C. § 1712(c)(6) and (7).  Plaintiff argues that BLM could not have

22   adequately weighed the project's benefits against its harms because it was unaware of

23   the project's impacts.  While Plaintiff does not expand on how BLM was unaware of

24   the project's impacts in its original motion for summary judgement, in the relevant

25   sections of its Opposition/Reply brief, it states that "BLM failed to adequately examine

26   and disclose the Project's impacts" and cites to the portions of its original brief which

27   argue that the Environmental Assessment was deficient.  (Pl.'s Opp'n. at 30.)  Based on

28   the alleged insufficiency of the Environmental Assessment, Plaintiff concludes "[t]hus,

1   in approving the Plan Amendment BLM could neither 'consider [the] relative scarcity

2   of the values involved and the availability of alternative means . . . and sites for the

3   realization of those values,' nor 'weigh the long-term benefits to the public against the

4   short-term benefits . . . .'" (*Id.*)  As such, this claim is premised on finding that the

5   Environment Assessment was insufficient.

6           Because the Court has found that the Environment Assessment did sufficiently

7   address the impacts of the project, this claim too must fail.

### iii.  Mitigation Measures

9           The FLMPA further requires an agency to mitigate the impacts of projects it

10   approves.  "Congress' grant of authority included the obligation to include terms and

11   conditions in each right-of-way which will, inter alia, 'minimize damage to scenic and

12   esthetic values and fish and wildlife habitat and otherwise protect the environment.'"

13   *Trout Unlimited v. U.S. Dep't of Agric.*, 320 F. Supp. 2d 1090, 1105 (D. Colo. 2004)

14   (quoting 43 U.S.C. § 1765(a)).  However, FLMPA mandates "are not tantamount to a

15   'specific statutory command requiring' agency action*." Gardner v. U.S. Bureau of Land*

16   *Mgmt.*, 638 F.3d 1217, 1222 (9th Cir. 2011).  Instead, the statute requires BLM to

17   "strik[e] a balance among many competing uses to which land can be put . . . ." *Norton*

18   *v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004) (quoting 43 U.S.C. § 1702(c)).  The

19   Secretary retains broad discretion to determine the appropriate terms and conditions

20   to place on projects to balance competing interests.  43 U.S.C. § 1765(b) (requiring

21   the imposition of terms and conditions "as the Secretary concerned deems necessary .

22   . .").

23           Plaintiff argues that BLM failed to issue appropriate mitigation measures in two

24   ways.  First, it argues that BLM did not implement suitable mitigation measures to

25   protect desert tortoise habitat, and second, BLM failed to comply with the California

26   Conservation Plan amendments because it did not determine whether suitable

27   mitigation opportunities existed in the portion of the right-of-way which passes

28   through land designated as an Area of Critical Concern.

1    The record shows that BLM did impose mitigation measures to protect desert

2  tortoise habitat beyond those required in the original FERC license.  It required that

3  desert tortoises in the area which would have been at risk of death due to construction

4  and access roads be captured and relocated.  (A.R. 15585.)  BLM also required that

5  the brine ponds, which would have impacted "47 acres of desert tortoise habitat, be

6  relocated to an already impacted area with "little habitat value." (A.R. 15586.)  Third,

7  BLM placed limitations on the culvert size to allow tortoise passage, but to be too

8  large for the desert tortoises to use them as shelter.  (A.R. 15595.)

9    As discussed above, BLM could not impose mitigation measures pursuant to

10  the Renewable Energy Plan amendments which conflicted with Eagle Crest's valid

11  existing right to the Energy Project.  As such BLM did not violate the FLPMA by not

12  requiring Eagle Crest to comply with the Renewable Energy Plan.  However, BLM *did*

13  require compensatory mitigation which would ordinarily be prescribed under the

14  Renewable Energy Plan to the extent possible.  And Eagle Crest further agreed to

15  voluntarily comply with compensatory mitigation standards in the Areas of Critical

16  Concern if mitigation opportunities exist, and if they did not, agreed to conduct

17  compensatory measures elsewhere.  Contrary to Plaintiff's assertion, BLM will identify

18  if mitigation opportunities exist.  (A.R. 010433-34.)  BLM incorporated this into the

19  requirements of the grant.  (A.R. 015651-52.)  As such, the grant actually requires

20  more mitigation than Eagle Crest would otherwise be legally subject to given its valid

21  existing right.

22    While Plaintiff may believe that BLM should have imposed additional or

23  different terms and conditions, the Court cannot say that BLM failed in its duty to

24  impose terms and conditions to minimize environmental harm while balancing Eagle

25  Crest's use of the land.  *See, e.g., Gardner*, 638 F.3d at 1222 ("[E]ven if off-road

26  vehicles were causing 'unnecessary or undue degradation,' it is within the BLM's

27  discretion to decide how to remedy such harm and manage the lands in accordance

28  with the multiple-use directive set forth in the FLPMA.").

33

#### iv.  Collocation and Alternatives

The FLPMA requires that, to the "extent practical," BLM must utilize rights of way in common "[i]n order to minimize adverse environmental impacts."  43 U.S.C. § 1763.  However, the Secretary still retains the ability to grant additional rights of way, or to require compatible uses on or adjacent to other rights of way.  *Id.*  In considering whether to grant a right-of-way, BLM must consider "national and State land use policies, environmental quality, economic efficiency, national security, safety, and good engineering and technological practices."  *Id.*  In addition, when developing or revising a land use plan, BLM must "consider . . . the availability of alternative means . . . and sites . . . ."  43 U.S.C. § 1712.

Plaintiff attempts to compose a different standard stating that the FLPMA "requires BLM to limit rights-of-way across the public lands to the extent feasible to reduce a proposed project's natural resource damage," and argues that BLM failed to comply with this mandate because it eliminated from further consideration or did not consider "feasible" alternatives.  (Pl.'s Opp'n. at 26 (citing 43 U.S.C. §§ 1701(a)(8), 1765).)  Neither of the statutes Plaintiff cites support such a reading.  First, section 1701(a)(8) requires that BLM ". . . *where appropriate*, will preserve and protect certain public lands in their natural condition . . . ."  This is not a requirement to limit natural resource damage whenever BLM may be theoretically capable of doing so, but where it is appropriate to do so based on the other considerations and mandates it must abide by.  Section 1765 is similarly taken out of context; that section does not require BLM to reduce a project's impact whenever feasible, but rather to develop terms and conditions to "minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment."  43 U.S.C. § 1765(a).  Accordingly, BLM only needed to consider the practicality of collocating the utility lines, it was not *required* to collocate the lines if it was not practical to do so.

In its discussion of alternatives to the proposed action, BLM did in fact consider whether collocating the lines with an existing right-of-way or within the designated

34

1   utility corridor would be practical.  As discussed above in Section III.A.iii, BLM

2   eliminated those collocation alternatives from further discussion because the other

3   potential corridors were full, because they could not serve the needs of the project

4   (such as not providing access to the specific wells needed for the waterline), or

5   because they would have required crossing other protected land.  *See supra* Section

6   III.A.iii.

7        Plaintiff takes issue with the fact that BLM considered Eagle Crest's need for

8   flexibility while rejecting the other two alternative means to the right-of-way, arguing

9   that such a consideration violates the FLMPA because "'[f]lexibility' is not synonymous

10  with *feasibility.*" (Pl. Mot. at 33 (emphasis in original).)  However, Plaintiff again

11  misunderstands the applicable standard.  BLM does not need to determine whether

12  an alternative is technically feasible, but whether it is practical based on, among other

13  considerations, "economic efficiency" and "good engineering . . . practices."  43 U.S.C.

14  § 1763.  Allowing the Right-of-Way Project limited flexibility for the final design and

15  implementation promotes such aims.  It was reasonable for BLM to conclude that not

16  allowing some limited flexibility would not have been practical.

17       The right-of-way which BLM did grant to Eagle Crest requires that the gen-tie

18  line pass partially through a California Conservation Plan designated utility corridor,

19  and partially though private lands.  (A.R. 015726, 015484.)  Further, most of the gen-

20  tie, with the exception of 1.7 miles, lines up with an existing transmission line.  (A.R.

21  015649.)  As such, only a portion of Eagle Crest's approved right-of-way passes

22  through BLM land outside of an existing right-of-way, and the remainder of the right-

23  of-way is collocated or outside of BLM administered lands.  Although Plaintiff would

24  have preferred BLM to assess every "feasible" alternative to the right-of-way and fully

25  collocate the right-of-way, this is not what was required of BLM.  In reviewing the

26  various existing corridors where the lines may have been collocated or placed

27  adjacent to, and the alternatives limiting the right-of-way, BLM satisfied the FLMPA.

28  And BLM did collocate the majority of the right-of-way where it was practical to do so.

1   The Court does not find that BLM's final determination on the practically of collocation

2   or its assessment of the potential alternatives was arbitrary.

3                                                ***

4        The Court finds that BLM complied with the FLMPA and did not act arbitrarily or

5   capriciously in granting the right-of-way and amending the land use plan.  The Court

6   GRANTS summary judgement to Defendants and Intervenor Defendant on Plaintiff's

7   Second and Third Claims for Relief.

8                    **C. Response to Plaintiff's Protests**

9        Plaintiff's final claim is that BLM's response to Plaintiff's protests was

10   procedurally insufficient in violation of the FLMPA and APA, and that BLM acted

11   arbitrarily and capriciously.  BLM, through its own regulations, has created an internal

12   administrative protest process, which allows parties who participated in the planning

13   process to protest a proposed plan amendment.  43 C.F.R. § 1610.5-2(a).  The BLM

14   director is required to review and consider the comments and issue a decision on the

15   protest prior to issuing a Decision Record.  43 C.F.R. § 1610.5-2(a)(3).  The response is

16   required to "be in writing and shall set forth the reasons for the decision." *Id.*

17        Plaintiff contends that BLM failed to comply with the protest regulations

18   because BLM directly addressed only two of Plaintiff's protests, and dismissed

19   Plaintiff's other protests on the ground that the protest letter did not contain a short

20   statement "explaining why the State Director's decision is believed to be wrong."

21   (A.R. 010417–18 (Response Letter); A.R. 004476–78, 004482–83 (Protest Resolution

22   Report).)  Defendants contend that although BLM did not respond to Plaintiff's other

23   protests in an individualized response, BLM did send a letter which set forth the

24   reasons for its decision in the Response Letter and did in fact address the relevant

25   points made by Plaintiff in its Protest Resolution Report.  (A.R. 004434-90.)

26        The protests Plaintiff issued were substantially similar to the issues raised in this

27   suit, which as the Court has discussed, largely concern the FERC Energy Project and

28   not the BLM Right-of-Way Project.  (A.R. Doc. No. 264.)  BLM's reasons for dismissing a

                                        36

number of Plaintiff's protests were that the protests included issues which "were not substantiated with a concise statement of why the State Director's proposed decision is believed to be wrong; issues not previously raised in the planning process; and/or issues not germane to the planning process." (A.R. 010417.)  To the extent that Plaintiff's protests concerned the FERC Energy Project, BLM's determination that the protests were not "germane to the planning process" and therefore not appropriate for further response, is reasonable.

To the extent that Plaintiff did raise protests that were relevant to the BLM Right-of-Way Project, BLM either issued an individualized response to Plaintiff in the Protest Resolution Report, or responded to the same or similar protests issued by others in the same report.  For example, although BLM did not directly respond to Plaintiff's protest about the desert tortoise, BLM did respond to a similar protest made by the Center for Biological Diversity. (*See* A.R. 004479.)  In this way, BLM complied with its regulation to "set forth the reasons for its decision" in writing.  There is no requirement that BLM respond to each protest individually so long as BLM issues a response.

The Court finds that BLM complied with the FLMPA in this regard and did not act arbitrarily or capriciously.  The Court GRANTS summary judgement to Defendants and Intervenor Defendant as to Plaintiff's Fourth Claim for Relief.

**IV.   Conclusion**

For the above reasons, IT IS HEREBY ORDERED that Defendants' and Intervenor Defendant's Motions for Summary Judgement are GRANTED in full, and Plaintiff's Motion for Summary Judgement is DENIED in full.

The Clerk of the Court is directed to enter judgement in favor of all Defendants and Intervenor-Defendant and close this case.

IT IS SO ORDERED.

Dated:   **September 29, 2023**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

37